* HARRY AND GERALDINE GORDON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2830-71.    Filed October 31, 1974.

---

* Supplemental Opinion appears at 63 T.C. 501 (1975).

52

*Bruce I. Hochman* and *Harvey D. Tack,* for the petitioners.
*Randall G. Dick,* for the respondent.

HALL, *Judge:* Respondent determined a $177,472.60 deficiency plus an $88,736.30 fraud penalty under section 6653(b)[1] in petitioners' 1967 Federal income tax return.

At the call of the calendar petitioners filed a "Motion to Suppress, Strike Affirmative Allegations in Respondent's Answer and for an Order that the Burden of Going Forward is on Respondent." The parties agreed to proceed with the trial, and that on brief any evidence developed during the trial could be used in considering the motion.

The issues presented are:

(1) Whether the statutory assessment herein is based upon evidence which should have been suppressed because one or more of petitioner husband's constitutional rights were violated when his gambling records were seized.

(2) Whether the respondent's method of determining additional partnership income of $273,782 was without foundation in fact, arbitrary, capricious, and excessive so as to shift the burden of proof to the respondent.

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the year in issue.

(3) Whether the underpayment of tax, if any, was due to fraud.

(4) Whether the additional income in 1967, if any, is wagering income not subject to averaging under section 1302(b)(3).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners husband and wife resided in Las Vegas, Nev., when they filed their petition herein. They timely filed their joint 1967 Federal income tax return with the district director of internal revenue at Reno, Nev. Hereinafter "petitioner" refers only to the husband, Harry Gordon.

During 1967, petitioner was an 80-percent partner in a partnership which operated a race and sports book wagering business licensed by the State of Nevada under the name of "Derby Turf Club" (hereinafter Derby), located at 113 South First Street, Las Vegas, Nev. Prior to January 25, 1967, petitioner operated the business as a sole proprietorship. On January 25, 1967, petitioner transferred a 20-percent interest in the Derby to his son-in-law, James Shoughro (hereinafter Shoughro), and thereafter the race and sports book business was operated as a partnership.

The business of the Derby during 1967 was to accept wagers on horseraces and sporting events which were taking place in various parts of the United States. A customer was generally supplied with a racing form listing all the race tracks or sporting events for which the Derby was to take bets on a particular day. The customer would offer to place his bet with a ticket writer who would write the wager on a printed ticket form consisting of an original and a duplicate. After the wager was written, the ticket was usually stamped on a machine which consecutively printed 6-digit serial numbers, time, and date. The sports book was open 7 days a week and the race book was closed only on Sunday.

During late 1966, petitioner leased some property across the street from the Dunes Hotel in Las Vegas. He had intended to open a race book in this general area, known as the "Strip," and the only way that he could find a suitable location was to take a master lease on a large shopping center. He took an active part in developing the shopping center, and within the center constructed and opened a bookmaking business. The plans for the

shopping center were drawn in December 1966, and construction began immediately. Much of petitioner's time between January and June of 1967 was devoted to developing the shopping center and the bookmaking business located there, subsequently known as the "Churchill." However, such activity did not prevent petitioner from looking after his other businesses, including the Derby.

The Churchill opened for business in June 1967, and petitioner and the bookkeeper moved their offices from the Derby, where they were previously located, to the Churchill. These offices handled the business affairs of both the Derby and the Churchill. Petitioner took full charge of operating the Churchill. In addition, petitioner went to the Derby daily, usually getting there by 7:30 a.m., picked up the mail, deposits, and wagering tickets, and returned to the Churchill. Petitioner went back to the Derby during the day from time to time.

During 1967, the sports book at the Derby was operated as a separate department. It was located in a room behind the race book. Mr. John Quinn (hereinafter Quinn) managed the sports book from February 1965 through January 1971.

Before Quinn went to work for the Derby, petitioner was having problems with the sports book. The performance of two previous people who had operated the sports book as lessees had been unsatisfactory. About 6 months to a year prior to Quinn's employment, the licensee of the sports book became insolvent and could not pay off the wagers. As a result of this the Derby received bad publicity because the public did not realize that the Derby did not own the sports book. The Nevada gaming commissioner then imposed a condition that the Derby could not lease out the sports book.

The sports book was an asset to a race book because sports players also bet on horses when they were on the premises and created a good deal of activity which attracted customers to the race book. When entering through the front door, the customer had to pass through the race book to get to the sports book. The sports book was operated as an accommodation to the Derby customers.

During 1967 the race book was managed by Shoughro. Petitioner set the policy for the management of both the sports and race books.

The Derby was on an accrual method of accounting during 1967, as it had been in prior years.

The daily "recap" reports for the race book were prepared by Shoughro and Philip Miller (hereinafter Miller), assistant manager of the race book. The recap reports for the sports book were prepared by Quinn and were done on a weekly or semi-monthly basis. Shoughro delivered all of the race and sports reports to the bookkeeper.

During the period January 1 through October 27, 1967, wagers were accepted on the Derby premises which were not reported in the Derby's books. These wagers in the sports book were accepted by Quinn, who destroyed the wagering tickets. In the case of the race book, Shoughro and Miller accepted such wagers. Miller would account to Shoughro for the unreported wagers which he received, and Shoughro would destroy all the wagering tickets. These unreported bets were not submitted to the bookkeeper and were not reflected in the records of the Derby. Such wagers were accepted both via telephone and in person.

During the period January 1 through October 27, 1967, the Derby had three types of bets: (1) Those on which the Federal wagering excise tax was collected from the customer and paid by the Derby to the Internal Revenue Service; (2) those known as "service refund" bets on which the Federal wagering excise tax was collected from the customer but returned if the customer lost, in which case the Derby itself paid the tax to the Internal Revenue Service; and (3) those on which no excise tax was collected or paid and which were not reflected in the books and records of the Derby.

During the period January 1 through October 27, 1967, there were six stamping machines at the Derby on which bets were placed in the race book, and five ticket writers. The sixth machine was used to record the bets which were not reported in the records of the Derby, and was turned back to zero each day. This machine was used by Shoughro and Miller.

During 1967 the Derby was subject to regulations of the Nevada Gaming Commission. Pursuant to its regulatory authority, in 1961 the Nevada Gaming Commission issued regulation 5.020, which reads as follows:

5.020 Race horse books and sports pools.

1. The commission and the board deem that race horse betting and sports pools are forms of gaming materially different from other types of gaming, and

that the public health, safety, morals, good order and general welfare of the inhabitants of the State of Nevada require especially stringent control and regulation of such activities. Accordingly, licensees operating race horse books or sports pools will be required to comply with the following regulations in addition to those applicable to licensees in general.

2. Race horse book or sports pool operations shall be conducted only in a building wherein no other types of games are operated or intoxicating beverages dispensed, and no other activities of any kind shall be permitted at any time in the room where race horse book or sports pool operations are carried on.

3. All bets accepted by race horse books or sports pools must be on an over-the-counter basis for cash, and consecutively numbered tickets shall be issued for each transaction. Paid stubs and copies of each ticket must be retained and shall be available for inspection by the board or its authorized agents at any time. No bets shall be placed by telephone, telegraph, messenger, or in any manner other than over-the-counter by the person making the bet. Paid stubs shall be filed chronologically by date of payment, and all copies, including cancellations, voids, mutilations and other unused numbers shall be filed in their proper order with used numbers to constitute a complete numerical sequence for each day's business. None of the foregoing may be destroyed without specific written permission of the board. The entire amount of federal tax shall be collected from the player and adequate records thereof maintained.

4. Layoff bets made by a race horse book or sports pool shall be placed only with bookmakers licensed by the State of Nevada. A proper record of all such bets must be kept and shall be available for inspection by the commission, the board or their authorized agents at any time. No such records shall be destroyed without specific permission of the board.

5. All records pertaining to the operation of any race horse book or sports pool, including, but not limited to, records hereinabove mentioned, telephone and telegraph messages and tolls and daily sheets, shall be chronologically filed and shall not be destroyed without written permission of the board.

6. Except upon written permission of the board, no licensee shall permit more than one telephone, whether public or private, to be installed or used in or upon the premises occupied by the licensee, and no such telephone shall have more than one telephone number.

7. Application for or use of a state gaming license for a race horse book or sports pool, or any renewal thereof, shall constitute authorization and consent by the licensee for the commission or the board to monitor or review, by any means, any telephone or telegraph message sent or received by a licensee or to or from the licensed premises; to examine and copy all records of any telephone or telegraph company pertaining to the business of licensee; and to obtain from any bank or other institution information concerning money transactions or transfers by or to the licensee.

8. Licensees shall keep the commission and the board informed of the source of all race or sports wire information or service received by them and the amounts paid by them for such information or service.

In mid-1967, at least five special agents of the Internal Revenue Service were assigned to investigate the excise tax

liability of the Derby. The first agent was assigned in April, one was assigned in June, two in July, and one in August. Two of the agents acted under cover and attempted to place wagers at the Derby without paying the 10-percent Federal wagering excise tax. They were successful in doing so.

The undercover agents placed 24 bets in the race book during the months of June, July, and August of 1967, one race bet in October, and two wagers in the sports book in October. All of the wagers in the race book were placed with Miller; the wagers in the sports book were placed with Quinn. No Federal wagering excise tax was collected on these wagers, and duplicate copies of the bet slips were not given to the undercover agents.

Melvin Goldenberg placed horse wagers at the Derby during 1967 over the telephone, on credit, without paying the Federal wagering excise tax and without receiving a duplicate wagering ticket. These facts regarding the activities of Melvin Goldenberg were known to petitioner.

Lester A. Banker placed sports wagers at the Derby without paying the Federal wagering excise tax and without receiving a duplicate betting ticket. His wagers were sometimes made over the telephone. Lester Banker knew petitioner as a neighbor and a friend. Petitioner knew of Banker's activities.

Martin Hirschhorn placed horse and sports wagers at the Derby during 1967 without paying the Federal wagering excise tax, without receiving a duplicate betting slip and using a code name.

Joseph Speranza placed horse wagers at the Derby during 1967. His wagers were placed with Miller and Shoughro. At times he did not pay the Federal wagering excise tax or receive a duplicate betting slip. His wagering tickets were marked with his initials, "JS."

David F. Jackson placed horse wagers at the Derby during 1967. Such wagers were made over the telephone. His wagering tickets were marked with his initials, "DFJ."

David Shapiro placed horse wagers at the Derby during 1967 with Miller and sports wagers with Quinn. He did not pay the Federal wagering excise tax or receive a duplicate betting slip.

Louis Wiener, Jr., petitioner's attorney since 1962, placed sports wagers at the Derby during 1967 without paying the Federal excise tax, without receiving a duplicate betting slip and using a code name.

For each month during 1967, petitioner caused to be filed with the district director of internal revenue at Reno, Nev., monthly Federal excise tax returns, Forms 730.

On April 9, 1968, petitioner caused to be filed a Federal partnership return, Form 1065, for the calendar year 1967 with the district director of internal revenue at Reno, Nev.

Petitioner was familiar with operating a licensed bookmaking establishment during 1967. He knew that it was difficult to obtain a bookmaking license in Nevada and that he could have lost his license for the activities which occurred at the Derby during 1967. Petitioner was aware of the skimming operation which was occurring at the Derby during 1967. Miller had worked for petitioner since 1963 and at the time of trial was still employed by petitioner.

An internal revenue agent and a special agent were assigned to investigate the Derby in October 1967, in order to determine the correctness of the reported wagering excise tax. An income tax investigation was begun after the excise tax investigation was completed.

Petitioner refused to honor a summons served on October 13, 1967, on the grounds that production of the subpoenaed records might tend to incriminate him.

On October 27, 1967, respondent's agents appeared before a United States commissioner and secured a search warrant to search the premises of the Derby.

A 14-page affidavit by Charles Spears, special agent of the Internal Revenue Service, executed on October 27, 1967, formed the basis for the warrant.

The warrant described the place to be searched as follows:

Derby Turf Club & Sports Service, 113 South First Street, a two story building located on the East side of First Street, with the upper story consisting of a structure set back from the roof edges and the ground floor premises containing a partition separating the horse betting area from the sports section, said partition being approximately 12 to 15 feet wide and containing restrooms and an office; said partition extending from the south wall of the premises approximately three quarters of the distance to the north wall with a horse betting counter approximately chest high with partitions to eye level containing openings for ticket sellers located along the north wall, and a cashiers. [sic] cage at the East end of said horse counter. Further described as containing a sports betting section located along the east wall of the building with a counter along this wall bearing a wooden partition thereon with openings for ticket sellers, *and* the persons of ticket sellers, proprietors and cashiers operating said premises, all in the city of Las Vegas, Clark County, Nevada.

The search warrant identified the items to be seized as follows:

Unprinted bet slips, 8″ × 11″ pads containing wager notations, 3″ × 6″ piece [sic] of paper containing wagering notations, printed wagering tickets, some bearing stamped serial numbers and some without, ticket stamping machines, some of which imprint a consecutive serial number and some of which do not, currency received for tax free wagers which are not recorded for wagering excise tax purposes and used to pay off such wagers, daily and monthly summary records, lists of amounts due and owed, lists of code names of bettors and layoff men, and other wagering paraphernalia; all of which is being used and has been used, or is designed or intended for use as a means of committing criminal offense in violation of Title 26, Section 7201 and Section 7206(1) and Title 18, Section 371, United States Code, to wit, continuing conspiracy to evade wagering excise taxes for the period June, 1967 through and including October of 1967, to file false monthly wagering tax returns for that period, and to defraud the Internal Revenue Service, U.S. Treasury Department in its lawful function of ascertaining and collecting the true excise tax liability of Harry Gordon, doing business as the Derby Turf Club, for the above months, by means of preparing and maintaining false wagering records which conceal and fail to reflect said true tax liability.

The warrant was executed at 2:06 p.m. on Friday, October 27, 1967. Among the items seized by respondent's agents on that day were horserace wagering tickets for the months of June through and including October 27, 1967, and the sports wagering tickets and parlay cards[2] for September through and including October 27, 1967.

The return of the search warrant showed that the following items introduced in evidence in this case were seized: (a) 47 bundles of Derby bet tickets for September and October 1967, from the offices and first floor storeroom; (b) three reels of tape recordings of telephone conversations, from the offices of the Derby; (c) bet tickets taken from the sports area; (d) bet tickets taken from the race book area; (e) 79 bundles of Derby bet tickets for the months of June, July, and August 1967, from the second floor storeroom.

One of the special agents during the raid found a reel of tape in a tape recorder in the private office of the Derby. He played the tape and determined that the tape was a recording of telephone calls placed and received at the Derby. A second reel of tape contained in a drawer immediately above the tape recorder was

---

[2] A parlay card is generally used in football wagering. It lists opposing teams and the point spread assigned them. These cards come out at the beginning of the week. A bettor must bet at least three teams.

also played, and it contained similar material. The tape recorder was plugged into an electrical outlet and contained a small electronic metal box attached to the recorder by wires, which appeared to be an automatic turnon and turnoff switch for purposes of recording incoming calls. A wire extending from the small metal box appeared as though it could be attached to telephone lines, but at the time of the raid the wires were not attached to the telephone lines but lay exposed on the floor of the office.

Messrs. Wiener and Goldwater appeared at the entrance of the Derby during the execution of the search warrant and were met by Special Agent Stanley Wheeler. They did not advise Wheeler that they were attorneys representing petitioner or Shoughro. They asked Wheeler if any arrests were taking place and Wheeler said no. Wheeler barred the door and indicated to Wiener and Goldwater that if they wished to be admitted to the Derby they would have to see Mike DeFeo, the Government attorney in charge of the search. At about that time DeFeo arrived and talked to Wiener and Goldwater. In reply to their questions he told them that a search warrant was being executed on the premises, that there were no arrest warrants, and that they could be present during the search so long as they did not interfere with the search of the premises. Wiener and Goldwater then left the Derby, but later Goldwater returned and was present during part of the search.

During the raid at the Derby, personnel of the Nevada Gaming Control Board were admitted to the Derby premises; they were not Federal employees and were not participating in the raid itself.

While the raid was in progress Mike DeFeo had a telephone conversation with Wiener concerning the opening of the safe at the Derby. On Wiener's assurance that there were no betting tickets in the safe, the safe was left untouched.

During the time of the raid there was a telephone at the Derby which could be used by Shoughro.

The purpose of the raid was to seize the bet tickets for the bets placed by the undercover agents. No consideration was given to a projection of income at that time.

The proposed assessment as set forth in the statutory notice of deficiency is not based upon any specific items of omitted income. Because the coded tickets were destroyed when they had served

their purpose by Quinn and Shoughro, the only known unreported gross receipts that the revenue agent was able to find were the wagers of the undercover agents in June, July, and August 1967. The determination in the statutory notice of deficiency is founded upon a projection based on wagers containing coded initials or numbers used to identify the bettors, which were seized during the raid. The wagers used as the basis of the projection are those for the day of October 27, 1967, through 2:06 p.m., the time of the raid. Respondent's agents assumed that those coded tickets were unreported, and projected unreported gross receipts and net income for the year based upon the wagering tickets for that portion of 1 day. The statutory notice of deficiency determined that $756,937.60 of race wagers and $1,814,124.39 of sports wagers, for a total of $2,571,061.99, was omitted from the gross income of the Derby. These amounts were computed by respondent as follows:

(A) *Race book.*—It was determined that on October 27, 1967, the race book accepted $4,182 in wagers. Of this amount, it was determined that $1,868 consisted of unreported wagers. Based upon this sample it was determined that only 55 percent of the gross wagers accepted by the race book were being reported in gross income for the first 9 months of 1967. This percentage figure was then divided into the amount of wagers shown on the excise tax returns for January through and including September 1967, which totaled $925,146. From this computation it was determined that the correct amount of gross wagers for this period was $1,682,083.60. The amount of gross wagers reported was then subtracted from the purported corrected figure and the difference of $756,937.60 was determined to be unreported income.

(B) *Sports department.*—It was determined that on October 27, 1967, the sports department accepted $4,490.50 in wagers. Of this amount it was determined that $3,935 consisted of unreported wagers. Based upon this sample it was determined that only 12 percent of the gross wagers accepted by the sports department was being reported in gross income for the first 9 months of 1967. This percentage figure was then divided into the amount of wagers shown on the excise tax returns for January through and including September 1967, which totaled $247,380.60. From this computation it was determined that the correct amount of gross wagers for this period was $2,061,504.99.

The amount of gross wagers reported was then subtracted from the purported corrected figure and the difference of $1,814,124.39 was determined to be unreported income.

No evidence was introduced demonstrating adequately that receipts on October 27, 1967, were unrepresentative of a typical day's receipts during 1967.

After recomputing the amount of gross wagers, respondent determined that the total corrected gross profit on horseraces was $410,574 and on sports events was $236,848. These amounts were determined as follows:

(A) *Sports.*—The gross-profit percentage for sports was determined to be 10 percent. Although the Federal excise tax returns for January through September reflected the breakdown of total wagers between sports and race, Federal excise tax returns for October, November, and December did not. Therefore, a percentage allocation between race and sports was arrived at by using the figures for January through September. Thus total adjusted wagers for January through September were determined to be $3,743,589, of which 55.07 percent or $2,061,505 were determined to be from sports events. To arrive at the gross sports wagers for October, November, and December, the amount of total wagers from the Federal excise tax returns for these 3 months was multiplied by 55.07 percent, yielding $306,973. This amount was then added to the gross sports wagers for January through September to obtain total gross sports wagers of $2,368,478; this sum was then multiplied by the gross-profit percentage of 10 percent to arrive at the purported corrected net win of $236,848.

(B) *Race.*—It was determined that $250,450 out of the total wagers for October, November, and December were race wagers using the same method described above for sports bets, with the percentage being 44.93. This amount was then added to the amount of race wagers reported on the excise tax returns for January through September to obtain $1,175,596. The amount of wagers reported for sports was determined to be $554,354 by adding $306,973 (determined as described in paragraph (A)) to the amounts reported as sports wagers on the excise tax returns for January through September. Since it was previously determined that the gross-profit percentage was 10 percent on sports wagers, 10 percent of $554,354 or $55,435 was subtracted from the net win reported on the partnership return for the

Derby to obtain $249,760 as the net win on race bets. This figure was then divided by $1,175,596 (the amount determined to be reported race wagers) to obtain a gross-profit percentage of 21.245393. It was then determined that the total corrected gross wagers for horseracing was $1,932,534 by adding the corrected gross wagers for January through September (determined in paragraph (A)) to the race wagers for October, November, and December ($250,450). This amount was then multiplied by the gross-profit percentage of 21.245393 to obtain $410,574, the total purported corrected gross profit on race wagers.

The computed gross profits for race bets and sports bets were then added together to obtain $647,422. From this amount, respondent subtracted the gross profit reported on the Derby's partnership return and increased partnership income by the difference of $342,227.

Respondent admitted during trial that one unreported sports wager had been computed at $1,600 for purposes of the statutory notice of deficiency, when, in fact, the wager was $16. Correction of this error increased the computed reported sports wagers from 12 percent to 19 percent and decreased the computed unreported income of the Derby from $342,227 to $261,762—a decrease of $80,465 or 31 percent of the corrected figure.

The gross income of the Derby is gambling income.

OPINION

## I. *Motion to Suppress*

Petitioner mounts multiple challenges to the admissibility of the Government's evidence, moving for dismissal of the notice of deficiency on the grounds that the Government secured the evidence on which the notice was based only by denying petitioner his rights under the fourth, fifth, and sixth amendments of the United States Constitution.[3] Respondent

---

[3] The fourth amendment provides as follows:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The fifth amendment provides, in part, as follows:

"No person * * * shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; * * *."

The sixth amendment provides, in part, as follows:

"In all criminal prosecutions, the accused shall enjoy the right * * * to have the

concedes that all its evidence derives from the governmental activities of which petitioner complains, but denies any constitutional impropriety in such activities. In the alternative, respondent contends with respect to petitioner's claim under the fifth and sixth amendments that even if petitioner's rights thereunder were denied him, we need not exclude evidence so obtained from this civil tax proceeding. For the most part, the facts are not seriously in dispute. We reserved decision on petitioner's motion at the time of trial. Since we find no constitutional impropriety in respondent's actions, we deny petitioner's motion without reaching the question whether evidence secured in derogation of rights under the fifth or sixth amendment is inadmissible in a civil tax proceeding.[4]

All respondent's evidence was obtained in or derived from a "raid" of the Derby Turf Club premises, a legal sports and horseracing gambling "book" in Las Vegas, Nev. Respondent seized materials in the raid including pieces of paper with notations assertedly representing gambling transactions, and reels of recorder tapes of telephone conversations. This, together with other evidence admitted at the trial, demonstrates clearly that at the Derby Turf Club numerous wagers were accepted which were not reported to the Nevada gambling authorities, and on which State wagering taxes and Federal gambling and income taxes were not paid. Petitioner, however, would have us exclude this evidence because of the manner of its seizure.

Under the fourth amendment, petitioner claims first that the warrant was a "general warrant," impermissibly broad both in its description of the area to be searched and the materials to be seized. In addition (or in the alternative), petitioner argues that

---

Assistance of Counsel for his defence."

[4] This Court has held that evidence obtained by unlawful search and seizure, contravening fourth amendment rights, is inadmissible in a civil tax proceeding. *Efrain T. Suarez,* 58 T.C. 792 (1972). Obviously, the fifth amendment presents different considerations. The constitutional ban on testimonial compulsion where the compelled witness faces criminal penalties does not preclude compelling testimony on which a mere civil liability may be based, in the absence of danger of criminal penalties. E.g., *People v. English,* 31 Ill. 2d 301, 201 N.E. 2d 455 (1964); 8 Wigmore, Evidence secs. 2223, 2254 (McNaughton rev. 1961). The question we need not decide is whether we will now follow the decision of the Court of Appeals for the Seventh Circuit in *Romanelli v. Commissioner,* 466 F. 2d 872 (C.A. 7, 1972), reversing this Court (54 T.C. 1448 (1970)), and holding that vindication of the fifth amendment privilege requires us to exclude in a civil tax proceeding evidence which could have properly been compelled had the Government been solely interested in civil tax liabilities, exclusively because such evidence was in fact improperly compelled for a criminal enforcement purpose.

the raiding party exceeded the warrant's terms in seizing items not authorized to be seized. Petitioner therefore seeks to exclude the evidence under our decision in *Efrain T. Suarez,* 58 T.C. 792 (1972). In *Suarez* we held that where it was stipulated that respondent's statutory notice of deficiency was based exclusively on evidence obtained by what we there found to constitute an unreasonable search and seizure, respondent's determination carries no presumption of correctness, and he must carry the burden of going forward with untainted proof to establish the existence of a deficiency. See also *Efrain T. Suarez,* 61 T.C. 841 (1974), on appeal (C.A. 5, June 20, 1974).

We hold *Suarez* inapplicable here, because we are unconvinced either that the warrant was overbroad, or that the search party's activities exceeded its authorization. Petitioner grounds his first overbreadth argument on the fact that the affidavit of Special Agent Spears focused on activities he observed on the ground floor of the building, in particular the area of the horse-betting counter. There Spears noted while some bets were serially numbered in compliance with Nevada law, and the 10-percent Federal gambling tax was collected thereon, other wagers were stamped with a date and time stamp without the required serial number on a different machine, or were not stamped at all, and no tax was collected thereon. Spears did not allege having had access to other areas of the two-story building, including the portions in which some of the evidence in question was found. The warrant meticulously described the two-story building, and, as petitioner concedes, it purported to authorize search of the entire building. Petitioner argues that the affidavit failed to identify the particular portions of the premises in which would be located the gambling paraphernalia to be seized. But petitioner cites to us no case in which an otherwise valid search warrant was rejected for failure to pinpoint the precise spot within a particular business premises in which evidence would be located. Instead petitioner relies on *Chimel v. California,* 395 U.S. 752 (1969), which decided the very different question of the permissible scope of a search incident to a lawful arrest, holding that there is no need to permit such a search (an exception to the usual requirement of a warrant) to extend beyond the area immediately within the arrested person's control. What was described and searched here was a two-story business premises

apparently of relatively modest dimensions (at least petitioner has not shown to the contrary), all under single control and all devoted to the petitioner's bookmaking business. Indeed, under Nevada law, no other business activities could be pursued there. See regulation 5.020 (par. 2) of the Nevada Gaming Commission. The facts recited in the affidavit afforded ample grounds for search of the entire building. There was probable cause to conclude that various bookkeeping and recording activities integral to the partnership business took place in the building behind the scenes, and that a search of the entire premises would be likely to uncover evidence of criminal activity, as in fact it did. The affidavit disclosed that wagering records had been some 3 months earlier observed on the second floor by a named informant, and that there was "an office space" on the ground floor.

The fourth amendment does not require the authorities to predict the precise location of evidence disclosed by a search before the search is made. It merely requires probable cause that search of a particular specified area will elicit evidence of criminal activities. There may be cases where the facts constituting probable cause would not justify search of an entire business premises. We hold only that, if so, this is not such a case.

We have given petitioner the benefit of the doubt in reaching this issue, for at the trial he stipulated, contrary to his contention on brief, that the warrant was issued on probable cause.

Petitioner's second "overbreadth" argument is that the warrant failed to describe with sufficient specificity the items to be seized. The warrant here authorized seizure of "unprinted bet slips, 8″ × 11″ pads containing wager notations, 3″ × 6″ piece [sic] of paper containing wagering notations, printed wagering tickets, some bearing stamped serial numbers and some without, ticket stamping machines, some of which imprint a consecutive serial number and some of which do not, currency received for tax free wagers which are not recorded for wagering excise tax purposes and used to pay off such wagers, daily and monthly summary records, lists of amounts due and owed, lists of code names of bettors and layoff men, and other wagering paraphernalia." Petitioner contends, apparently, that the reference to "other wagering paraphernalia" is overbroad. However, he does not accompany his contention with any argument or citation of relevant authority. In *Stanley v. Georgia,* 394 U.S. 557 (1969), a

search warrant covering the appellant's two-story residence was issued for the purpose of discovering evidence of illegal gambling activity. The warrant, issued on probable cause, authorized seizure of "bookmaking records, wagering paraphernalia consisting of bet slips, account sheets, recap sheets, collection sheets, adding machines, money used in or derived from the wagering business, records of purchases, records of real estate and bank transactions, the money for which was derived from the wagering business, *and any other property used in the wagering business,* which are being used and/or have been used in the operation of a bookmaking business or represent the fruits of a bookmaking business being operated in violation of sections 4411, 4412 and 7203 I.R.C. of 1954." (Emphasis added.) 394 U.S. at 570 fn. 2 (concurring opinion). The Supreme Court of Georgia upheld this search warrant. 224 Ga. 259, 161 S.E. 2d 309 (1968). The conviction was reversed on other grounds by the United States Supreme Court. In an opinion, concurring in the result, Mr. Justice Stewart, joined by Justices Brennan and White, observed regarding this warrant, that the warrant was lawful:

> The warrant described "the place to be searched" with particularity. With like particularity, it described the "things to be seized"—equipment, records, and other material used in or derived from an illegal wagering business. * * *
>
> There can be no doubt, therefore, that the agents were lawfully present in the appellant's house, lawfully authorized to search for any and all of the items specified in the warrant, and lawfully empowered to seize any such items they might find. It follows, therefore, that the agents were acting within the authority of the warrant when they proceeded to the appellant's upstairs bedroom and pulled open the drawers of his desk. But when they found in one of those drawers not gambling material but moving picture films, the warrant gave them no authority to seize the films. [Fns. omitted. 394 U.S. at 570-571.]

The warrant in our case was no less particularized, either as to description of the area to be searched or the property to be seized, than that in *Stanley.* We believe that the Government is no more held to a standard of omniscience in being able to describe with precision every instrument used by a criminal in carrying out his illegal activities than it is in being able to divine in advance the precise corner of a business location in which evidence may be secreted. We hold that the warrant adequately specifies the material to be seized.

Petitioner's final fourth amendment point is his contention that the raiding party exceeded its authority under the warrant in seizing two reels of tape which recorded telephone calls placed and received at the Derby. Giving a narrow reading to the term "wagering paraphernalia," petitioner first argues that the tapes were not caught under that heading. They were "not used in the wagering process" he says. However, they in fact constituted records of a type not only used in, but obviously essential in, the wagering process. The warrant expressly covered "daily and monthly summary records" and "lists of amount due and owed," all of which are no more clearly used in the wagering process than the taped records in question. The medium in which records are preserved would not affect their character as "wagering paraphernalia," within the clear intent of the warrant.

We are next met with the argument that the records had to be played before one could be sure they pertained to the wagering business, and that there was no authority in the warrant to play them. Being located at an establishment where the sole permitted activity, and for all that appears in the record the only activity in fact, was wagering, there was probable cause to believe that the records pertained to that activity and constituted gambling paraphernalia; certainly cause enough to justify playing the records to find out. A search officer who has probable cause to believe that an item discovered in the course of a lawful search is within the class of objects lawfully authorized to be seized may make such reasonable investigation as is necessary to determine whether it in fact is within that class. Were it otherwise, a search party authorized to seize gambling records would be stymied by a closed ledger book, for until it is opened there may be no way to tell whether it is in fact a gambling record. The situation is different where a lawful search to discover evidence of one crime happens upon an item which clearly is not evidence of the specific crime but may be evidence of an entirely different crime. In such a case, the investigation must be limited to what is in plain view. *Stanley v. Georgia, supra* (Stewart, *J.,* concurring). Books may not be opened nor papers read where the authorized search is limited to narcotics. *United States v. Dichiarinte,* 445 F. 2d 126 (C.A. 7, 1971). We find, and are cited to, no authority, however, supporting the proposition that where the search is for gambling records and paraphernalia, and where there is probable cause to believe that a given record was a gambling record, the search

party may proceed no farther unless the fact that it is a gambling record is apparent. If a drawer may be opened to discover evidence inside, we see no reason why (given probable cause) the pages of a book may not be turned to see whether evidence lies inside. And if the pages of a book may be turned, a record may be played. The advent of electronic records does not prevent ascertainment of the contents of a record, where there is probable cause to believe that it pertains to the wagering business, merely because the ear rather than the eye must be employed and because the tapes have to be played in order to be heard. We therefore find no merit in petitioner's contention that an unlawful search and seizure took place.

Petitioner next argues that he was forced to incriminate himself in contravention of his rights under the fifth amendment. He contends that the seizure of his partnership business records even without his assistance, and during an otherwise lawful search, is precluded because under the protection of the fifth amendment, he could not have been forced to produce them himself or to disclose where they were secreted. While at first blush, the absence of any testimonial compulsion against petitioner in a seizure of business records under a search warrant might seem to preclude any argument based on the fifth amendment, petitioner points to decisions, including one by the Court of Appeals to which appeal in this case would lie (the Ninth Circuit), upholding such fifth amendment claims. *Vonder Ahe v. Howland,* (C.A. 9, 1973, 31 AFTR 2d 73-1075, 73-1 USTC par. 9333), reversing (N.D. Cal. 1971, 27 AFTR 2d 71-1176, 71-1 USTC par. 9315); *Hill v. Philpott,* 445 F. 2d 144 (C.A. 7, 1971). The Sixth Circuit has held to the contrary. *United States v. Blank,* 459 F. 2d 383 (C.A. 6, 1972), certiorari denied 409 U.S. 887 (1972). However, one factor present in the present case renders it unnecessary to consider further this fifth amendment contention. The records herein were not the private records of petitioner, but the regular business records of an organized partnership, conducting a well-established and regular business, and in which petitioner was a partner. In *Bellis v. United States,* 417 U.S. 85 (1974), the Supreme Court recently held that a partner in a three-man law partnership may be directly compelled to produce records of his partnership's business over his fifth amendment objections. A fortiori, unless

something adequately distinguishes petitioner's partnership from Bellis', petitioner may not be heard to complain under the fifth amendment that his partnership records were seized under a search warrant, where his own participation in the seizure was neither invited nor required.

Bellis, the senior partner of a three-man law firm, refused on asserted fifth amendment grounds to produce subpoenaed partnership records in his possession. He was held in civil contempt by the United States District Court. The Court of Appeals for the Third Circuit affirmed, per curiam, holding that the privilege against self-incrimination did not apply to "records of an entity such as a partnership which has recognizable judicial existence apart from its members." 483 F. 2d 961, 962. The Supreme Court granted certiorari and again affirmed. The Court stated that "the privilege against compulsory self-incrimination should be 'limited to its historical function of protecting *only the natural individual* from compulsory incrimination through his own testimony or personal records'." 417 U.S. at 89-90, quoting *United States v. White,* 322 U.S. 694, 701 (1944). (Emphasis added.) The Court stressed the fifth amendment's role in protecting a "private enclave where he may lead a private life." *Murphy v. Waterfront Commission,* 378 U.S. 52, 55 (1964). The Court's language retains the privilege for a sole proprietorship's business records, but makes it clear that the fifth amendment is not to provide a cloak of privilege around organized and structured business activities engaged in by partnerships, any more than by corporations.

The Derby Turf Club was as much an organized and structured business partnership as the three-man law firm in *Bellis.* In fact, the Derby's institutional identity was considerably clearer, for the personal characteristics of the partners of a gambling establishment would be far less central to the firm's success or identity than those of the partners of a law firm whose stock in trade is the personal services of its partners. The facts that here there were two rather than three partners, and that they were father and son-in-law, rather than being unrelated as in *Bellis,* does not appear to us to be determinative. Although the Court in terms leaves open the question of "a small family partnership," 417 U.S. at 101, no fair reading of *Bellis* leaves much legitimate room for speculation that the result there would have been different had there only been two partners, or had the law firm

members happened to have been father and son-in-law. The following language from *Bellis* could, except for the shorter duration of the partnership in this case, have been written of the Derby Turf Club as well as of the Bellis partnership, and would have held just as true if the Bellis partnership had had only two related partners operating, together with their employees, as an established law firm. It offers little comfort to two-men or family partnerships in general where a closely organized business operation of institutional character is involved.

While small, the partnership here did have an established institutional identity independent of its individual partners. This was not an informal association or a temporary arrangement for the undertaking of a few projects of short-lived duration. Rather, the partnership represented a formal institutional arrangement organized for the continuing conduct of the firm's legal practice. The partnership was in existence for nearly 15 years prior to its voluntary dissolution. Although it may not have had a formal constitution or bylaws to govern its internal affairs, state partnership law imposed on the firm a certain organizational structure in the absence of any contrary agreement by the partners; for example, it guaranteed to each of the partners the equal right to participate in the management and control of the firm, 59 Pa. Stat. Ann. § 51(e) (Purdon's 1964), and prescribed that majority rule governed the conduct of the firm's business, *id.,* § 51(h). The firm maintained a bank account in the partnership name, had stationery using the firm name on its letterhead, and, in general, held itself out to third parties as an entity with an independent institutional identity. It employed six persons in addition to its partners, including two other attorneys who practiced law on behalf of the firm, rather than as individuals on their own behalf. It filed separate partnership returns for federal tax purposes, as required by § 6031 of the Internal Revenue Code. State law permitted the firm to be sued, 12 Pa. Stat. Ann. Rule 2128 (Purdon's 1967), and to hold title to property, 59 Pa. Stat. Ann. § 13(3), in the partnership name, and generally regarded the partnership as a distinct entity for numerous other purposes. [417 U.S. at 95-97. Fns. omitted.]

Petitioner has not demonstrated that the partnership herein was any less a "formal institutionalized arrangement" than that in *Bellis.* It filed formal partnership returns, "maintained a bank account in the partnership name, had stationery using the firm name on its letterhead, and, in general, held itself out to third parties as an entity with an independent institutional identity." 417 U.S. at 96-97.

As in *Bellis,* moreover, the seized records were partnership, not individual, property. Indeed, no claim is made to the contrary. We hold, therefore, that because the records in question were partnership properties, petitioner's fifth amendment contention is not well taken. In doing so, we need not, and do not, reach the

further question whether the fifth amendment claim suffers from the further infirmity of being unavailable to prevent production of business records required by regulatory authorities to be kept. *Shapiro v. United States,* 335 U.S. 1 (1948).

Petitioner's final contention is that he was deprived of his sixth amendment right to counsel during the search. We need not here decide, however, the as yet unsettled issues whether counsel must be permitted to be present on request at a search pursuant to a warrant, or whether respondent's determination in a *civil* tax proceeding may be overcome because petitioner was denied that right to counsel to which he is entitled "in all criminal prosecutions." We have found as a fact that petitioner's attorneys were not denied admittance to the Derby while the raid was in progress, and that one of petitioner's attorneys in fact was present during part of the search.

For the reasons stated, we deny petitioner's Motion to Suppress, Strike Affirmative Allegations in Respondent's Answer, and for an Order that the Burden of Going Forward is on Respondent.

## II. *Respondent's Determination of Additional Partnership Income*

Petitioner contends that respondent's method of determining additional partnership income was arbitrary, capricious, and excessive so as to shift the burden of proof to the respondent. Respondent argues that where, as here, a taxpayer fails to keep adequate books and records, respondent is authorized to compute the taxpayer's tax liability by whatever method, in the opinion of the respondent, will clearly reflect the taxpayer's income.

The Derby kept excellent records of the wagers it received on which the Federal wagering excise tax and Federal income tax were paid. However, it kept no record of any kind of the coded wagers on which no excise tax and no income tax were paid. In fact, Messrs. Shoughro and Quinn systematically destroyed any records of such wagers when they no longer needed them. The only copies of such coded wagers respondent ever saw were obtained as a result of the execution of a search warrant at 2:06 p.m. on Friday, October 27, 1967. The respondent's agents did not know before the raid that the coded wagers were systematically destroyed.

The wagers used as a basis for respondent's projection of the Derby's unreported income are those for October 27, 1967, through 2:06 p.m., the time of the raid. Respondent's determination is presumed correct unless proved to be arbitrary and excessive. *Helvering v. Taylor,* 293 U.S. 507 (1935). Where petitioner proves respondent's determination to be arbitrary (i.e., without rational foundation in fact and based upon unsupported assumptions) and excessive, petitioner has no burden of proving the correct amount of tax which he may owe. This Court must then determine from the facts in the record, without regard to the presumption of correctness generally attaching to respondent's determination, the correct tax liability of the petitioner. See, e.g., *Nat Harrison Associates, Inc.,* 42 T.C. 601, 617 (1964).

However, the burden is on the petitioner to demonstrate in the first instance that the respondent's determination is arbitrary and excessive before respondent's determination is stripped of its presumption of correctness. *Harold E. Harbin,* 40 T.C. 373, 376 (1963).

As the Court stated in *Harold E. Harbin, supra* at 377:

It is recognized that the "burden to adopt a method that will clearly reflect the income is on the Government equally as well as on the taxpayer." *Bradstreet Co.* v. *Commissioner,* 65 F. 2d 943 (C.A. 1, 1933). This does not mean, however, that where a taxpayer had deliberately and willfully failed and refused to keep and maintain any books or records of his business transactions, the Commissioner, in making his determination of a deficiency, is required to compute the net income of the taxpayer with mathematical exactness. "Under such circumstances, approximation in the calculation of net income is justified." *Harris* v. *Commissioner, supra* [174 F. 2d 70 (C.A. 4, 1949)]. To hold otherwise would, as the Supreme Court stated in *United States* v. *Johnson,* 319 U.S. 503, "be tantamount to holding that skillful concealment is an invincible barrier to proof."

See also *Shades Ridge Holding Co., Inc.,* a Memorandum Opinion of this Court, affirmed per curiam sub nom. *Fiorella v. Commissioner,* 361 F. 2d 326 (C.A. 5, 1966). "It is well settled that the Tax Court may properly reevaluate the evidence and reach its own findings, even though the record may be such that the result will be only an approximation based on the best records available, particularly where, as here, the taxpayer kept no records as the law required. Moreover, in arriving at the tax deficiency, the Tax Court, as the trier of the facts, is warranted in bearing heavily against the taxpayer, whose failure to **keep**

records has created the dilemma." (Citations omitted.) *Mitchell v. Commissioner,* 416 F. 2d 101, 102-103 (C.A. 7, 1969), affirming a Memorandum Opinion of this Court.

Petitioner admits that coded wagers were made at the Derby and that those wagers were not reflected in the books and records of the Derby. Respondent's agents, properly assuming that the coded wagers seized on October 27, 1967, would not have been reported for tax purposes, based their projection of the Derby's unreported gross receipts and additional unreported net income for the year 1967 upon the coded wagering tickets written on October 27, 1967, prior to the raid.

Petitioner attacks respondent's projection on numerous grounds which we will consider individually.

1. Petitioner argues that respondent's investigation was inadequate because it was directed solely at proving specific wagers on which Federal wagering excise tax was not paid, and no thought was given at the time of the investigation to a projection of gross wagers omitted from the Derby's partnership income tax return. Respondent's agent did not consult a statistical expert to determine the best kind of statistical sampling to acquire and did not conduct the raid at the end of the day to get at least 1 full day's coded bets instead of just part of 1 day's coded bets. Moreover, respondent's surveillance did not begin until June 1967, yet the statutory notice is directed at the period January through September 1967. Respondent's agents did not spend long periods of time in the Derby, did not determine whether more wagers were placed in the morning or afternoon, and did not accumulate a list of customers who placed wagers without paying the Federal excise tax.

Respondent answers that petitioner, without pointing to any authority, is advocating that the burden is on the respondent to conduct an investigation which would result in a mathematically exact computation of omitted income, whereas in fact the petitioner is under a duty to keep adequate records so that he, not the respondent, can determine his correct tax liability. Sec. 6001; *Harold E. Harbin, supra.* Moreover, the best sampling of coded bets respondent could have obtained in this case had he known that Messrs. Shoughro and Quinn methodically destroyed coded bets when they were finished with them, was 1 full day's coded bets. Respondent had no way of knowing when or how often the coded bets were destroyed. Moreover, although respondent did

not begin his surveillance until June, petitioner, Shoughro, Miller, and Quinn all admitted the coded wagers on which no excise or income tax was paid were taken from January until the raid in October. Petitioner has attempted to prove what he claims respondent should have discovered, namely, that more horse wagers were taken in the morning than in the afternoon. However, we were not persuaded by petitioner's evidence at the trial that this is the case. Petitioner also complained that respondent did not accumulate a list of customers who placed coded bets. But, while this fact was known to petitioner, he himself did not produce such a list or produce as witnesses at the trial any such customers.

Petitioner's complaint that respondent's investigation did not bear out facts that he carefully concealed and therefore respondent's projection is arbitrary is disingenuous, in view of the unambiguous requirement that the Derby keep adequate records to clearly reflect its income. Sec. 6001.

2. Petitioner further complains that because the agents executed the search warrant and conducted the raid at 2:06 p.m. instead of waiting until the wagers for the day were concluded, respondent made his projection based on less than 1 full day's coded bets, thereby substantially warping the results for that day. Respondent replies that he was required to use a search warrant because petitioner refused to comply with a summons served on him for the production of the Derby's records. Furthermore, any chosen day would have yielded similar results since the coded wagering tickets were destroyed when they had served their purpose. Respondent had no way of knowing that the wagering tickets were not destroyed after each race or sports event.

We agree with respondent that a taxpayer who destroys records and has no means for showing the amount of income cannot be heard to complain that the respondent's determination is not mathematically correct. In fact, petitioner has not shown that the determination is even excessive, and under the circumstances we do not find it to be arbitrary.

3. Petitioner argues that respondent in his determination used too high a gross-profit percentage for both the sports wagers and the horse wagers.

We conclude that the best measure of the Derby's gross-profit percentage in both its sports and horse departments on coded bets was that percentage that the books and records reflect for

reported bets. This information was made available by the petitioner for the first time during the trial [5] by the introduction of ledger sheets and portions of the cash receipts journal.

The gross-profit percentage of the sports book used by respondent was not based on that reported by the Derby either in its tax returns or its books and records, but was based on respondent's "expert opinion" and was determined to be 10 percent. The expert based his opinion on football wagers, but he admitted at the trial that the gross-profit percentage for a balanced book [6] was 4.54 percent, and for baseball wagers was substantially lower. Petitioner failed to persuade us that the Derby, in fact, did maintain a balanced book in the sports book. Quinn testified that his *aim* was to maintain a balanced book, but he was unable to remember any important details regarding this or the other more relevant facts relating to coded wagers for 1967.

With regard to the gross-profit percentage on horse racing, respondent accepted the gross-profit percentage reported by the Derby on uncoded wagers. Petitioner, however, claims that coded horse wagers were made by "sophisticated" bettors and would therefore produce a lower gross profit than the wagers recorded in the books and records of the Derby. We were not so persuaded. The only customers placing coded wagers who were called to testify were called by respondent. Petitioner did not choose to call as witnesses any code-name bettors to substantiate his claim. We cannot find on any evidence before us either that coded bettors were more "sophisticated" bettors or that they won more often than other bettors.

The Derby's gross-profit percentage for the horse book for 1967 according to its books and records (which reflect only bets on which the Federal excise tax was paid and do not reflect coded bets on which no tax was paid) was 21.07 percent. We conclude

---

[5] Petitioner's complaint that the respondent did not request the Derby books and records, other than those seized in the raid, before issuing his determination in April 1971, is frivolous inasmuch as petitioner had refused to deliver the Derby's records when served with an administrative subpoena on the grounds that production of such records would tend to incriminate him. The statute of limitations for such criminal proceedings did not run until sometime in 1973.

[6] A balanced book in football, for example, is where the same amount of money is bet on both sides at the same point level. For example, if U.S.C. and Notre Dame were playing, and U.S.C. were favored by seven points, a balanced book would consist of two bets, one on Notre Dame plus seven points and one on U.S.C. giving seven points.

that the gross profit attributable to the horse book operation for 1967 is $429,790.83, computed as follows:

| | |
|---|---|
| Gross wagers, January through September (respondent's corrected projection) | $1,682,083.60 |
| Gross wagers, October through December (Derby's books) | 357,740.00 |
| Total | $2,039,823.60 |
| Multiplied by gross-profit percentage | 21.07% |
| Gross profit—horses | $429,790.83 |

The Derby's gross-profit percentage for the sports book for 1967 according to its books and records was 7.79 percent. We conclude that the gross profit attributable to the sports book for 1967 is $116,981.35, computed as follows:

| | |
|---|---|
| Gross wagers, January through September (respondent's corrected projection) | $1,302,003.14 |
| Gross wagers, October through December (Derby's books) | 199,683.00 |
| Total | $1,501,686.14 |
| Multiplied by gross-profit percentage | 7.79% |
| Gross profit—sports | $116,981.35 |

Using the above calculations, the total gross profit of the Derby for 1967 was $546,772.18, of which only $305,195 was reported on its partnership return, leaving $241,577.18 unreported. Petitioner's 80-percent interest in the unreported profit of the Derby is $193,261.74.

The gross-profit percentage includes an offset to gross wagers for Federal wagering tax which accrues at the time the bet is received by the Derby. Petitioner noted that respondent's method of projecting income had failed to allow a deduction or offset to income for the accrual of excise tax for the Derby, an accrual basis taxpayer. We agree with petitioner that the Derby is entitled to accrue the wagering tax and, as noted above, have allowed such accrual by using the gross-profit percentage from the Derby's own books and records which reflect such accrual. "Under an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy. * * * Where a deduction is properly accrued on the basis of a computation made with reasonable accuracy and the exact amount is subsequently

determined in a later taxable year, the difference, if any, between such amounts shall be taken into account for the later taxable year in which such determination is made." Sec. 1.461-1(a)(2), Income Tax Regs. The wagering excise tax accrued as soon as the Derby took a wager; the only question is the amount of unreported wagers the Derby took in 1967. We determine the amount of such wagers in this litigation. On those wagers the excise tax accrued in 1967 and is reflected in our determination.

4. Petitioner claims respondent is at fault for failing to attempt to reconstruct petitioner's income through the net worth or bank deposits method, and that intensive investigation of earlier years of petitioner produced no change in his reported income.

Respondent correctly replies that he is not compelled to compute unreported income by several methods for the sake of corroboration if in his best judgment the method used produces a reasonably correct result considering the absence of required records. The determination of the respondent is prima facie correct unless shown to be arbitrary and excessive. Petitioner cites no authority for his contention. He could have, but did not, seek to rebut the respondent's determination with his own net worth analysis. See, e.g., *McGarry v. United States,* 388 F. 2d 862 (C.A. 1, 1967). The fact that there was no change in petitioner's earlier years' reported income is irrelevant to the issue in this case.

5. Petitioner also points to specific factors he claims particularly affect October 27, 1967, which he contends should have caused respondent to change his projections. Such factors are that bets of two of the coded bettors that day (Joseph Speranza and Melvin Goldenberg) were unusually high for them, and that the net result of the wagering of the Federal agents conducting the investigation showed a net loss to the Derby. However, petitioner does not claim that this day was an unusual day or that there were any special events that would have attracted more than the usual number of bettors or larger bets. On any specific day there are going to be regular bettors who bet more heavily than usual and those that do not bet at all, and certain groups of bettors who win while others lose. As we have said frequently before, petitioner cannot complain of inexactitude that flows from those actions he has authorized and condoned, namely, the destruction of the only records that could have

clearly shown the amount of income he omitted. E.g., *Webb v. Commissioner,* 394 F. 2d 366 (C.A. 5, 1968), affirming a Memorandum Opinion of this Court. Petitioner would have us accept the testimony of Shoughro, his son-in-law and partner, that he had earned profits of around $24,000 in the horse book during 1967 by this procedure. We do not find Shoughro's testimony credible.

We conclude that respondent's projection of the amount of income omitted by the Derby in 1967 is not arbitrary and excessive, and that petitioner, who has the burden of proof, has not shown it to be erroneous. We have adjusted the figure somewhat in light of the evidence presented at trial. We also conclude that the omitted income was the income of the Derby, a partnership of which petitioner was entitled to 80 percent of the profits, and not the individual incomes of Shoughro and Quinn. The activities generating this income were carried on at the Derby by Derby employees (Quinn and Miller) and a Derby partner entitled to 20 percent of the Derby's profits (Shoughro); these persons held themselves out to the coded bettors to be doing business on behalf of the Derby. We simply do not believe them or petitioner when they contend that petitioner was willing to forego gratuitously his share of the profits from the taking of coded bets, a practice which risked his valuable gambling license from the State of Nevada.

### III. *Fraud Penalty*

The burden is on the respondent to prove by clear and convincing evidence that petitioner's underpayment of tax was due to fraud. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure.

Petitioner contends that the omitted income belonged to Messrs. Shoughro and Quinn, or, if some of it were partnership income attributable to petitioner, it is clear the parties themselves honestly believed that the profits from the coded wagers belonged to Shoughro and Quinn. While petitioner allowed the coded bets to be taken, he did not participate in taking such bets.

Shoughro claims he took coded bets to improve the Derby's business. He never satisfactorily explained, however, how his pocketing the profits from these bets helped increase the Derby's profits. Petitioner's position is that he felt an $80,000 profit from

the Derby was enough for him, and he was agreeable to letting his son-in-law and the manager of the sports book skim a little profit off the business for themselves. He claims his only interest in the sports book was that it not lose money. Petitioner never explained satisfactorily why, for altruistic reasons, he would condone illegal activity at the Derby's place of business which jeopardized the valuable gambling license issued to him by the State of Nevada and exposed him to the possibility of being charged with the crimes of wagering excise and income tax evasion.

Notwithstanding the foregoing, the actual destruction of the records was done by Shoughro and Quinn only and not by petitioner. While their testimony is weak, illogical, and in Quinn's case incomplete due to his inability to remember important facts, and while petitioner's story is not itself convincing, there is little in the record other than the inherent improbability of the witnesses' stories to connect petitioner directly to the skimming operation being conducted. While we have no difficulty in sustaining respondent's basic determinations herein, it is a much closer question whether petitioner's fraud has been proved by the requisite degree of clear and convincing evidence. On balance, we are not persuaded that respondent has carried his heavy burden of proving fraudulent conduct by petitioner by clear and convincing evidence, and we therefore cannot, and do not, sustain the fraud penalty asserted.

## IV. *Income Averaging*

Petitioner contends that the wagering income he received as his distributive share of the Derby's partnership income in 1967 did not constitute "wagering income" within the meaning of section 1302(b)(3),[7] because incurred in the regular business of taking bets, and if it did, the provision is unconstitutional in that it discriminates against the wagering income and deprives petitioner of the equal protection of the law, contrary to the

---

[7] SEC. 1302. DEFINITION OF AVERAGABLE INCOME; RELATED DEFINITIONS.

(b) ADJUSTED TAXABLE INCOME.—For purposes of this part, the term "adjusted taxable income" means the taxable income for the computation year, decreased by the sum of the following amounts:

    * * *

    (3) WAGERING INCOME.—The amount (if any) by which the gains from wagering transactions for the computation year exceed the losses from such transactions.

"equal protection" guarantee which inheres in the due process clause of the fifth amendment to the United States Constitution.

The income averaging provision in effect for the year in issue was enacted as part of the Revenue Act of 1964. At that time Congress provided that several classes of income, including net gains from wagering transactions, would be ineligible for the benefits of income averaging. The committee reports indicate that this was done to prevent such income from receiving a preferred status. H. Rept. No. 749, 88th Cong., 1st Sess. (1963), 1964-1 C.B. (Part 2) 236; S. Rept. No. 830, 88th Cong., 2d Sess. (1964), 1964-1 C.B. (Part 2) 646. The term "wagering transactions" is not defined either in the statutes or the committee reports, but there is evidence that Congress had in mind the same type of transactions as is mentioned in section 165(d),[8] dealing with the deduction for wagering losses. H. Rept. No. 749, *supra,* 1964-1 C.B. at 418. See also sec. 1.1302-2(d), Income Tax Regs.

With regard to wagering gains or losses, no distinction appears to have been made in section 165(d) between legal and illegal gambling,[9] or between wagering incurred in business or in a transaction entered into for profit on the one hand, and wagering incurred for sport and recreation on the other hand. *Humphrey v. Commissioner,* 162 F. 2d 853 (C.A. 5, 1947), affirming in part and reversing in part a Memorandum Opinion of this Court, certiorari denied 332 U.S. 817 (1947). Even when gambling is a taxpayer's business, net gambling losses may not, under section 165(d), be used as a carryback or carryover against gambling gains of prior or succeeding years. *Skeeles v. United States,* 95 F. Supp. 242 (Ct. Cl. 1951), certiorari denied 341 U.S. 948 (1951); *Roy T. Offutt,* 16 T.C. 1214 (1951).

The distributive share of partnership income derived from wagering transactions passes through to the partner as wagering gains or losses, and does not lose its identity as such in the partner's hands. Sec. 702; *Jennings v. Commissioner,* 110 F. 2d 945 (C.A. 5, 1940), certiorari denied 311 U.S. 704 (1940).

---

[8] SEC. 165. LOSSES.

(d) WAGERING LOSSES.—Losses from wagering transactions shall be allowed only to the extent of the gains from such transactions.

[9] The committee report discussing sec. 23(g) of the 1934 Act, the predecessor of sec. 165(d), indicated that the courts had held that illegal gambling losses could be deducted only to the extent of gains from such transactions, and a similar limitation on losses from legalized gambling is provided in the bill. H. Rept. No. 704, 73d Cong., 2d Sess. (1934), 1939-1 C.B. (Part 2) 554.

Since petitioner's gains were literally "wagering income," and since the policy underlying the income averaging exclusion does not appear, in the light of the construction given analogous provisions in section 165(d), to require us to strain the statutory language to provide favorable treatment to such gains, we conclude that petitioner's wagering income derived from the Derby constitutes wagering income within the meaning of section 1302(b)(3), and is excluded from income in the computation year 1967 for purposes of income averaging.

Section 311 of the Tax Reform Act of 1969 modified section 1302 by eliminating wagering income, among others, from the classes of income which were disqualified for purposes of income averaging. The major reason for the amendment was to simplify the income averaging computations. The Ways and Means Committee Report further explained that denying averaging to wagering income imposes an impliedly higher tax rate on it than on other income.[10]

Petitioner claims that the exclusion of wagering income from income averaging prior to its elimination by the Tax Reform Act of 1969 was unconstitutional in that it discriminated against wagering income and violated petitioner's right to equal protection of the law. Petitioner is under a heavy burden when he seeks to prove section 1302(b)(3) unconstitutional. See *Nicol v. Ames,* 173 U.S. 509, 514-515 (1899). The Supreme Court has held, concerning the equal protection clause of the fourteenth amendment, that a classification that has some reasonable basis does not offend the Constitution simply because that classification in practice results in some inequality. *Dandridge v. Williams,* 397 U.S. 471, 485 (1970). This line of reasoning is equally applicable to the Federal legislature and possible fifth amendment limitations on power to tax. See *John A. Bayless,* 61 T.C. 394 (1973); *Michael P. Nammack,* 56 T.C. 1379, 1383-1384 (1971), affirmed per curiam 459 F. 2d 1045 (C.A. 2, 1972), certiorari denied 409 U.S. 991 (1972).

---

[10] The Senate Finance Committee report did not agree with the House provision. It stated that making wagering income available to averaging would provide such income an unwarranted benefit and would be inconsistent with the general purpose of the averaging provision, as was concluded in 1964 when wagering income was deliberately excluded. S. Rept. No. 91-552, 91st Cong., 1st Sess. (1969), 1969-3 C.B. 499. The Senate, however, receded on this point in the conference committee. Conf. Rept. No. 91-782, 91st Cong., 1st Sess. (1969), 1969-3 C.B. 644, 659.

We hold that disqualifying wagering income (along with capital gains, income attributable to gifts and bequests, and improper distributions to owner-employees from self-employed plans) from income averaging is not a prohibited classification for tax purposes. Congress did not wish to give gambling income (among other income) the preferred status which it gave to taxpayers' other fluctuating income. H. Rept. No. 749, *supra,* 1964-1 C.B. at 238; S. Rept. No. 830, *supra,* 1964-1 C.B. at 646. Wagering income has traditionally received less beneficial treatment than other income. See sec. 165(d). In part this arises from Congress' legitimate concern that gambling gains frequently are not reported for income tax purposes unless a taxpayer desires to deduct his gambling losses. See H. Rept. No. 704, 73d Cong., 2d Sess. (1934), 1939-1 C.B. (Part 2) 570. Under all the circumstances, we hold the classification not to be so arbitrary or unreasonable that we can find section 1302(b)(3) to be unconstitutional.

*Decision will be entered under Rule 155.*