ROBERT W. BRADFORD, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bradford v. Commissioner
Docket Nos. 12973-80, 12974-80.
United States Tax Court
T.C. Memo 1984-601; 1984 Tax Ct. Memo LEXIS 75; 49 T.C.M. (CCH) 105; T.C.M. (RIA) 84601; November 19, 1984. Robert W. Bradford, pro se. Gerald J. Beaudoin, for the respondent. GOFFE MEMORANDUM FINDINGS *76 OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioner's Federal income tax and additions to tax as follows: Additions to Tax
Year
Deficiency
6653(b) [1]
6654
1973
$14,020
$7,010
1974
174,741
87,371
$5,572
1975
212,579
106,290
9,179
1976
185,732
92,866
6,915
1977
57,813
28,907
21,058
After concessions by the parties, the issues for decision are: (1) the amount of income petitioner failed to report with respect to his laetrile distribution activities during the years in issue; and (2) Whether petitioner is liable for the additions to tax sought by respondent. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and accompanying exhibits are so found and incorporated herein by reference. Petitioner resided in Redwood City, California, when he filed his petitions. Petitioner was employed at the Stanford Linear Accelerator Center of Stanford *77 University in Stanford, California, as an engineer for the taxable years 1973, 1974, 1975 and 1976. Petitioner joined Stanford University in 1966 as a full staff member after receiving an honorary degree in engineering based largely upon practical experience obtained in the armed forces and private sector employment. While associated with Stanford University, petitioner published several papers pertaining to engineering physics and obtained several patents in the areas of plasma physics and pulse modulator circuits. Later, in conjunction with his work at Stanford University, petitioner entered the medical electronics field and was part of the team which developed the first linear accelerator for the treatment of human cancer at the Stanford Medical Center. In 1972, petitioner was asked to review a report written by two Stanford University physicians supporting the California Department of Health's ban on laetrile. [2] Until various court decisions in the mid-1970's, discussed hereafter, infra note 4, the Food and Drug Administration (hereinafter referred to as the "FDA") also banned the importation of laetrile into the United States because its medical use had not *78 been approved. Laetrile is derived from apricot pits and bitter almonds and is believed by many to be useful in the treatment of cancer. The medical community is divided concerning its therapeutic abilities. Cancer patients either ingest laetrile tablets or inject it intraperitoneally, intramuscularly or intravenously. Although, in 1972, petitioner had not formed an opinion concerning the efficacy of laetrile as a cancer treatment, he published a paper strongly criticizing the report prepared by the Stanford University physicians as a poor piece of research. In the following months, petitioner became convinced that laetrile possessed some therapeutic value in the treatment of cancer. [3] When an Albany, California, physician was arrested in 1972 for dispensing laetrile to his patients, petitioner met with the physician to offer research assistance and political *79 support and to help him raise funds for his legal defense. In July 1972, petitioner and several other individuals in the Los Altos, California, area formed the Committee for Freedom of Choice in Cancer Therapy, Incorporated (hereinafter referred to as the "Committee"), to raise funds for the Albany, California, physician's legal defense. Petitioner was President of the Committee. The Committee's activities later expanded to include a vast informational network concerning the efficacy of laetrile as a cancer treatment. The Committee generally believed that various groups in the United States including major pharmaceutical companies, the American Medical Association, the American Cancer Society and the FDA had vested interests in traditional cancer therapies, i.e., chemotherapy, radiation and surgery. According to Committee members, these groups unjustly suppressed the use of laetrile as an effective and relatively cheap alternative cancer therapy; hence, Committee members characterized *80 this deception "Cancergate" in reference to the infamous political intrigues of the early 1970's. During the years in issue, the Committee published the monthly periodical "Choice," produced a movie, issued literature, assisted in the publication of several books and conducted numerous well-attended symposiums throughout the United States. The Committee's informational activities were addressed to both the medical community and lay persons. Petitioner usually attended the Committee's seminars and frequently made presentations or acted as the master of ceremonies. At the end of these symposiums, announcements were usually made indicating that the speakers would discuss with interested individuals how they might obtain laetrile. The Committee gave out individuals' names for further information on laetrile. The Committee did not, however, actively participate in the distribution of laetrile to interested persons, although several Committee members (including petitioner) subsequently formed and operated a huge laetrile distribution system in their individual capacity. By early 1973, the Committee refocused its energies away from its public education program to a national political *81 movement whose goal was the legalization of laetrile.Although the Committee continued its public education activities, it now held strategy sessions and organizational meetings to garner support for its legalization efforts which were to be conducted on a state-by-state basis. In mid-1973, the Committee learned that several American physicians whose patients were taking laetrile were encountering increased difficulty in obtaining the necessary laetrile. Petitioner traveled to Mexico, a leading source of this material, to further investigate the matter. He eventually located a major laetrile factory which had ample supplies of the product. Soon thereafter, petitioner decided to begin smuggling laetrile into the United States from Mexico for distribution to sympathetic physicians. The decision to distribute the laetrile only to physicians was based upon a conscious effort to enlist the support of the established medical community which petitioner felt was essential for the achievement of the Committee's legalization goal. In 1973, petitioner approached Frank Salaman, a local businessman who was also sympathetic to the Committee's cause and later became vice president *82 of the Committee, for assistance in his laetrile smuggling endeavors. A partnership was formed whereby Mr. Salaman would help petitioner fund and administer their importation activities and they agreed to divide the profits equally. An elaborate distribution system was soon established involving "mules," i.e., individuals hired to carry the contraband across the borders, and regional distributors who would purchase the laetrile and resell it to physicians. This smuggling operation eventually expanded to supply approximately 1,200 physicians with laetrile. Most of the partnership's transactions were made with cash in accordance with the parties' desires. In response to increased laetrile smuggling into the United States from Mexico, the U.S. Customs Service formed a task force in 1975. Petitioner's name surfaced frequently in this investigation. In December 1975, an informant alerted authorities to a shipment of $3,900 vials of laetrile which were to be smuggled across the border near San Ysidro, California. Customs officials permitted the laetrile to enter the United States on December 19, 1975, and kept this shipment under surveillance. On December 20, 1975, petitioner *83 and two other individuals rendezvoused with this shipment in Gilroy, California, and took possession of the laetrile. As Customs agents followed petitioner and the laetrile, he fled and a high-speed chase ensued. Eventually, petitioner's automobile was stopped and he was arrested. A search of petitioner's automobile revealed: 3,900 vials of laetrile; numerous books and records relating to laetrile transactions for the taxable years in issue and a loaded nine-millimeter pistol with additional ammunition. The agents also seized approximately $12,000 from petitioner and $17,000 from another occupant of the car. Despite his arrest on laetrile smuggling charges, petitioner continued to illegally import laetrile during 1976 while awaiting trial. At the same time, several terminally ill cancer victims throughout the United States instituted suit against the FDA challenging its ban on the use of laetrile as a cancer treatment. The results of these suits were generally mixed and limited to the specific plaintiffs until April 1977 when Judge Bohanon of the U.S. District Court for the Western District of Oklahoma [4] issued a class action order enjoining the FDA and other governmental *84 agencies from impeding or preventing the importation and subsequent interstate transportation of laetrile to any terminally ill cancer victim for his own personal use provided a practicing physician submitted an appropriate affidavit. Thereafter, pursuant to this affidavit procedure, laetrile could be legally imported and distributed to terminally ill cancer victims. In early 1977, petitioner, Frank Salaman and two other individuals (including the Albany, California, physician whose arrest prompted the formation of the Committee) were tried in U.S. District Court for the Southern District of California on various laetrile smuggling charges.[5] After a lengthy trial, all were convicted of conspiracy and smuggling charges. Petitioner was fined $40,000 and received three years probation. The remaining defendants also were fined and placed on probation. In addition to the U.S. Customs Service's task force investigation of petitioner's laetrile smuggling activities, the FDA was apprised of petitioner's involvement in similar matters by mid-1976 as the *85 result of other independent investigations. Thereafter, petitioner and other individuals in his organization were kept under surveillance as the FDA began to trace their laetrile shipments.In a later effort to document these laetrile shipments, the FDA began to intercept these goods when they were delivered to common carriers for shipment. In accordance with the appropriate procedures, FDA investigators opened these shipments; examined, photographed and inventoried the contents; repackaged the goods and allowed them to continue toward their destination. This interception program began in January 1977 and continued until July of that year. During this time period, the FDA inspected approximately 25 percent of the partnership's total laetrile shipments. The vast majority of these intercepted shipments originated from Frank Salaman's home or one of his businesses. Finally, the FDA supplemented its investigation of this particular smugggling enterprise by removing discarded documents from trash receptacles at the Committee's headquarters and Frank Salaman's residence. In May 1977 and in response to the class action order in Rutherford v. United States, No. CIV-75-0218-B, *86 petitioner and Frank Salaman formed Cyto Pharma, U.S.A., a California corporation based in Los Altos, California, to legally import laetrile for distribution to physicians participating in the affidavit program. They posted the necessary import bonds with the U.S. Customs Service. The corporation filed a Federal corporate income tax return for the taxable year 1977 reporting gross sales of $673,362 over a seven-month period. Yet, before the close of this calendar year, petitioner established that Frank Salaman was still smuggling laetrile into the United States outside of the affidavit program and selling directly to cancer victims. Petitioner believed such activities would jeopardize both the importation bond they had posted and their current probation; hence, he forced Salaman to terminate his participation in Cyto Pharma, U.S.A. Petitioner later accused Salaman of embezzling approximately $50,000 from the firm and filed suit to recover same. After these incidents, all relationships between these individuals were severed. During the years in issue, petitioner and Frank Salaman's laetrile distribution partnership had the following gross receipts, cost of goods sold and net *87 profits: Gross
Costof
Net
Year
Receipts
Goods Sold
Profits
1973
$166,809
$155,916
$50,893
1974
590,833
308,707
282,126
1975
600,747
291,210
309,537
1976
3,436,597
1,813,492
1,623,105
1977
852,440
449,833
402,607
During the years in issue, petitioner used a portion of his distributive share of these partnership profits for various Committee expenses. Petitioner did not maintain books and records of such expenditures. During the taxable years 1974, 1975 and 1976, petitioner received the following wages from the Stanford Linear Accelerator Center: Year
Amount
1974
$18,884
1975
7,348
1976
1,229
During 1975, petitioner sold his Hawthorne Avenue residence and did not purchase another residence within 18 months of the sale. On January 9, 1974, petitioner submitted a Form W-4, "Employees Withholding Exemption Certificate" to his employer, Stanford Linear Accelerator Center, claiming 22 exemptions. On January 9, 1975, he submitted another Form W-4 to this employer claiming 30 exemptions. Petitioner timely filed a Federal individual income tax return for the taxable year 1973. On said *88 return, he correctly reported all of the wages he received from Stanford Linear Accelerator Center but did not report any income or expenses from his laetrile distribution activities. For the taxable years 1974, 1975, 1976 and 1977, petitioner did not file any Federal individual income tax returns. Petitioner knew he was required to file Federal individual income tax returns for the taxable years 1974, 1975, 1976 and 1977 and was advised by his attorney to file returns for these taxable years. Petitioner had filed Federal individual income tax returns for the previous 26 taxable years. Finally, petitioner failed to cooperate with agents of respondent in their attempt to determine his taxable income for the years in issue. In a notice of deficiency (the date of which does not appear in the record) pertaining to the taxable year 1973, the Commissioner determined that petitioner was engaged in the trade or business of distributing laetrile and related products. The Commissioner also determined that during this taxable year, this business had gross receipts of $166,809, cost of goods sold of $155,916 and a resulting net profit of $50,893. Based upon these calculations, the Commissioner *89 determined a deficiency in petitioner's 1973 Federal income tax in the amount of $14,020 and also determined that the imposition of a civil tax fraud addition to tax pursuant to section 6653(b) in the amount of $7,010 was warranted. In a notice of deficiency dated April 15, 1980, the Commissioner again determined that petitioner was engaged in the trade or business of distributing laetrile and related products during the taxable years 1974, 1975, 1976 and 1977. With respect to these taxable years, the Commissioner made the following determinations of gross receipts, cost of goods sold and net profits for the years in which petitioner failed to file returns: Gross
Cost of
Net
Year
Receipts
Goods Sold
Profits
1974
$590,833
$308,707
$282,126
1975
600,747
291,210
309,537
1976
614,169
324,092
290,077
1977
228,860
120,769
108,091
In making these determinations, the Commissioner attributed all of the net profits from the laetrile distribution business that both petitioner and Frank Salaman were engaged in only to petitioner. As of the date of trial, the Commissioner had not determined any deficiencies in income with respect to *90 Frank Salaman and his laetrile distribution activities. The Commissioner also determined that the imposition of additions to tax for civil tax fraud and failure to pay estimated taxes pursuant to sections 6653(b) and 6654, respectively, was warranted.The Commissioner's determinations in his April 15, 1980, notice of deficiency resulted in the following deficiencies and additions to tax: Additions to Tax
Year
Deficiency
6653(b)
6654
1974
$174,741
$87,371
$5,572
1975
212,579
106,290
9,179
1976
185,732
92,866
6,915
1977
57,813
28,907
21,058
Total
630,865
315,434
23,724
In his opening statement at trial, respondent announced his intention to seek increased deficiencies and additions to tax for the taxable years 1976 and 1977 resulting from petitioner's stipulation that he was in the laetrile distribution business for these entire taxable years. Immediately after trial, respondent filed a Motion for Leave to File Amendment to Answer to Conform Pleadings to Proof and an amendment to his answer on August 23, 1983, seeking increased deficiencies and additions to tax. In the amendment to his answer, respondent alleged that *91 petitioner had the following new total gross receipts, cost of goods sold and net profits for the taxable years 1976 and 1977: Gross
Cost of
Net
Year
Receipts
Goods Sold
Profits
1976
$3,436,597
$1,813,492
$1,623,105
1977
852,440
449,833
402,607
The alleged increased net profits result in the following new total deficiencies and additions to tax for the taxable years 1976 and 1977: Additions to Tax
Year
Deficiency
6653(b)
6654
1976
$1,119,002
$559,501
$41,625
1977
263,974
131,987
9,382
On September 6, 1983, we granted respondent's motion to amend his answer to conform with the proof presented at trial. Petitioner specifically denied the allegations set forth in respondent's amended answer in his amended reply. On July 2, 1984, respondent notified this Court that jeopardy assessments were made against petitioner on June 13, 1984, for the following taxable years and amounts: Taxable
Additions to Tax
Year
Tax
6653(b)
6654
Total
1974
$ 174,741
$ 87,371
5,572
$ 267,684
1975
212,579
106,290
9,179
328,048
1976
1,119,934
559,501
41,625
1,721,060
1977
265,278
131,987
9,382
406,647
Totals
$1,772,532
$885,149
$65,758
$2,723,439
*92 In the Notice of Jeopardy Assessment dated June 13, 1984, respondent set forth the following reasons for this action: (1) petitioner's failure to file Federal income tax returns for the taxable years 1974, 1975, 1976 and 1977; (2) petitioner's admission that he was engaged in the illegal importation of laetrile during these taxable years and his extensive cash dealings associated with these activities; (3) the apparent lack of property within the United States in petitioner's name with which to satisfy the deficiencies in tax and additions to tax both determined by the Commissioner and also sought as increased deficiencies; and (4) a belief that petitioner was purchasing substantial amounts of gold, other rare metals, and property outside the United States. OPINION We initially note that pursuant to section 6861(c), we have jurisdiction to redetermine the amount of the deficiencies and additions to tax already assessed by the Commissioner pursuant to the jeopardy assessment provisions. For organizational purposes, we will discuss the income and addition to tax issues separately. Issue 1. Income
The first issue for decision is the amount of income *93 petitioner failed to report with respect to his laetrile distribution activities during the years in issue. In the notices of deficiency mailed to petitioner, the Commissioner determined that petitioner failed to report the following amounts of laetrile distribution income: Year
Amount
1973
$50,893
1974
282,126
1975
309,537
1976
290,077
1977
108,091
At trial, it was established that, for the years in issue, respondent has attributed all of the laetrile distribution income resulting from the operation petitioner was associated with (exclusive of the activities of Cyto Pharma, U.S.A.) to petitioner; no other individual or entity was alleged to have laetrile distribution income. The Commissioner's determinations are presumptively correct, Welch v. Helvering,290 U.S. 111, 115 (1933), and petitioner bears the burden of proving them to be erroneous. Rule 142(a). At the commencement of trial, respondent announced his intention to seek increased deficiencies for the taxable years 1976 and 1977 as the result of additional laetrile distribution *94 income that petitioner allegedly received. After trial, we granted respondent's motion to amend his answer to conform with the proof presented at trial and respondent now contends that petitioner failed to report the following new total amounts of income from his laetrile distribution activities for the following years: Year
Amount
1976
$1,623,105
1977
402,607
With respect to these taxable years, respondent bears the burden of proving that petitioner had any laetrile distribution income in excess of the amounts set forth in the notice of deficiency. Rule 142(a). Petitioner freely admitted that he was engaged in the business of distributing laetrile for the years in issue. He, however, vehemently disagrees with the Commissioner's determinations in several respects. First, petitioner contends that a partnership existed between Frank Salaman and himself with respect to their laetrile distribution activities and any profits resulting therefrom were divided equally. Second, petitioner asserts that his resultant share of these partnership profits were greatly overstated in the Commissioner's determinations and this was largely due to the Commissioner's *95 failure to allow numerous offsets for expenses incurred with respect to Committee activities as they traveled across the United States promoting the efficacy of laetrile. Further, with respect to the gross amounts of unreported laetrile distribution income, petitioner, citing Helvering v. Taylor,293 U.S. 507 (1935), and other cases, contends that he has clearly shown the Commissioner's determinations to be erroneous; hence, such determinations lack their traditional presumption of correctness. In support of this latter argument, petitioner relies heavily on: (1) various alleged defects in respondent's proof supporting the determinations; (2) his own testimony concerning his laetrile distribution activities; and (3) the testimony and books and records reconstruction of Beverly Newkirk, a former Committee member. Respondent initially contends that the record clearly supports his determination that any and all profits resulting from the laetrile distribution activities engaged in by petitioner are attributable solely to petitioner. He further asserts that while his revenue agents gave petitioner the benefit of the doubt with respect to any business expenses *96 when they reconstructed his books and records for the years in issue, petitioner is not entitled to any additional business expense offsets due to lack of substantiation. Finally, respondent contends that the record amply supports both the Commissioner's determinations set forth in the notices of deficiency and the increased deficiencies sought in his amended answer. With respect to the initial question of whether petitioner's laetrile distribution activities were conducted in equal partnership with Frank Salaman, we note that under California law, a partnership need not be evidenced by writing. Calada Materials Co. v. Collins,184 Cal. App. 2d 250, 7 Cal. Rptr. 374 (2d Dist. Ct. App. 1960). In resolving this matter, we must discount the testimony of the two alleged partners. After observing the demeanor of these individuals while testifying and examining their testimony in light of the record, we have grave doubts concerning their veracity. We can, however, resolve this issue on the basis of the entire record. Several individuals knowledgeable about petitioner's laetrile *97 distribution activities, including David Gill, petitioner's counsel at his laetrile smuggling trial, Beverly Newkirk, a Committee member, and Duane Sincerbox, who was approached by petitioner and Frank Salaman to assist them in their partnership, all corroborated petitioner's partnership claims. Further, the books and records seized incident to petitioner's December 1975 arrest, which respondent relied upon to reconstruct petitioner's income, also indicate numerous and substantial cash distributions to Frank Salaman. Mr. Salaman was unable to satisfactorily explain the bases for such distributions. We, therefore, hold that petitioner has carried his burden of proving that he was in an equal partnership with Frank Salaman with respect to their laetrile distribution activities during the years in issue. Rule 142(a). Accordingly, only 50 percent of the laetrile distribution partnership's net profits are taxable to petitioner for the years in issue. From our holding that petitioner's laetrile distribution activities were conducted in partnership with Frank Salaman, we must now ascertain the partnership's total net profits during the years in issue. As noted earlier, *98 petitioner contends that he has clearly shown the respondent's determinations to be erroneous; hence, they have lost their traditional presumption of correctness. Respondent, in turn, asserts that the record amply supports both the Commissioner's determinations and the increased deficiencies set forth in his amended answer. With respect to the parties' presentations concerning the partnership's net profits during the years in issue, petitioner's proof primarily consisted of reconstructions of the income prepared by Beverly Newkirk, a former Committee member, and the testimony of petitioner. Ms. Newkirk, however, had no accounting background and had never performed similar reconstructions of income. Further, her income analyses were flawed in several major respects due to the reliance upon incorrect assumptions concerning unit costs of laetrile products. Petitioner's testimony was self-serving and we seriously question petitioner's veracity. Respondent's presentation, on the other hand, was as thorough and exhaustive as could be expected under the circumstances.Richard Raker, a U.S. Customs Service employee and Joseph Reader, a revenue agent, painstakingly reconstructed *99 the partnership's gross receipts, cost of goods sold and resulting net profits for the taxable years 1973, 1974 and 1975 from the records seized from petitioner incident to his December 1975 arrest. Their conservative analyses, which afforded petitioner every reasonably benefit of the doubt, took months to complete. For the taxable year 1976, Mr. Reader again utilized the partnership's books and records, albeit for a 63-day period at the end of the year, in order to project the laetrile distribution income for the entire year. Finally, for the taxable year 1977, Mr. Reader used the records of the shipments intercepted by the FDA to project laetrile distribution income for the year. It should be pointed out that the Commissioner's initial determination of deficiencies and the increased deficiencies sought in respondent's amended answer are largely based upon partnership books and records, albeit in incomplete set. Further, there is an almost total dearth of supporting receipts for such records due to a partnership decision to conduct this business in cash. Finally, although petitioner was afforded ample opportunity to assist respondent in reconstructing his income for *100 the years in issue, he declined to do so. With respect to petitioner's claim that he has shown the Commissioner's determinations to be erroneous, we have held in similar challenges that a tazpayer must prove such determinations to be "arbitrary (i.e., without rational foundation in fact and based upon unsupported assumptions) and excessive" in order to prevail. Gordon v. Commissioner,63 T.C. 51, 73 (1974), supplemental opinion 63 T.C. 501 (1975), affd. on this issue 572 F.2d 193 (9th Cir. 1977). Further, we have held that estimates and projections of income based upon a reasonable review of available information are sufficient to maintain the presumption of correctness for respondent's determinations. Gordon v. Commissioner,supra.
After a through review of the record in light of petitioner's claim, we hold that he has not shown any of the Commissioner's determinations to be arbitrary or excessive. In fact, given the amount of information with which respondent's agents had to work with, they did a commendable job of *101 reconstructing this covert partnership's laetrile distribution income for the years in issue. The underlying assumptions utilized by respondent's agents in their calculations were inherently reasonable. Further, even petitioner's legal counsel for his criminal smuggling trial generally agreed with respondent's computations. Finally, respondent's refusal to allow expense deductions does not render the determinations excessive or unreasonable in cases when no records or other credible substantiation of such expenses is offered. Estate of Mason v. Commissioner,64 T.C. 651 (1975), affd. per order 566 F.2d 2 (6th Cir. 1977). After rejecting petitioner's contentions that he had shown the Commissioner's determinations to be arbitrary and erroneous, such determinations retain their traditional presumption of correctness, Welch v. Helvering,290 U.S. 111, 115 (1933), and petitioner bears the burden of proving them to be erroneous. Rule 142(a). Upon review of the evidence submitted by petitioner, we hold that he has failed to carry *102 his burden. We were not particularly impressed with Ms. Newkirk's reconstruction of the partnership's books and records. Her analysis was flawed by the use of assumptions unsupported by the record and she had no prior accounting or similar experience in reconstructing accounting records. Further, petitioner's testimony was equally unpersuasive given our doubts concerning his veracity. Finally, petitioner's failure to adequately substantiate any of his claimed laetrile distribution expenses precludes any deductions for such expenditures. Accordingly, subject to our holding that petitioner was in equal partnership with Frank Salaman, we sustain the Commissioner's determinations of the partnership's net profits. Rule 142(a). The only remaining matters pertaining to the amount of laetrile distribution income attributable to petitioner are the increased deficiencies sought by respondent in his amended answer with respect to the taxable years 1976 and 1977. In his notice of deficiency dated April 15, 1980, respondent determined that petitioner had gross income from his laetrile distribution activities in the following amounts: Year
Amount
1976
$290,077
1977
108,091
*103 In his amended answer, respondent now asserts that petitioner realized the following additional amounts of gross income from his laetrile distribution activities: Amount of
Year
Additional Income
1976
$933,070
1977
206,161
Respondent bears the burden of proof with respect to such increased deficiencies. Rule 142(a). With respect to the taxable year 1976, the increased deficiency sought by respondent stems from income projections for the entire year based upon petitioner's own books and records for a 63-day period late in the year. As to the taxable year 1977, respondent's increased deficiency results from projections based upon FDA records of intercepted laetrile shipments. Petitioner did not produce any original books and records in response to discovery requests and he refused to cooperate with respondent's agents when they were reconstructing his income. In such instances, we have held that reasonable projections and estimates of income are an acceptable *104 means of establishing a deficiency in income. Harbin v. Commissioner,40 T.C. 373 (1963); cf. Gordon v. Commissioner,supra. Further, [I]t is well settled that the Tax Court may properly reevaluate the evidence and reach its own findings, even though the record may be such that the result will be only an approximation based on the best records available, particularly where, as here, the taxpayer kept no records as the law required. Moreover, in arriving at the tax deficiency, the Tax Court, as the trier of the facts, is warranted in bearing heavily against the taxpayer, whose own failure to keep records has created the dilemma. [Mitchell v. Commissioner,416 F. 2d 101, 102-103 (7th Cir. 1969), affirming a Memorandum Opinion of this Court; citations omitted.] After a thorough review of the record, we hold that respondent has carried his burden of proof with respect to the increased deficiencies sought in his amended answer for the taxable years 1976 and 1977. For the taxable year 1976, respondent's projections, although *105 relatively large in comparison to other taxable years, are inherently reasonable in light of the extensive sales reflected in petitioner's records for a 63-day period late in the year. Petitioner offered no credible evidence to suggest that this sample period included an extraordinary level of sales. [6] For the taxable year 1977, respondent's projections also are inherently reasonable given the large number of laetrile shipments intercepted and documented by the FDA. Petitioner's claim that some of these intercepted shipments represented either Mr. Salaman's laetrile distribution activities outside of the partnership or the activities of Cyto Pharma, U.S.A., were not satisfactorily corroborated with credible evidence. Accordingly, subject to our holding that petitioner was in equal partnership with Frank Salaman, respondent has carried his burden of proof with respect to the partnership's additional net profits. Rule 142(a). Issue 2. Additions to Tax
We have found that petitioner underpaid his Federal income tax for the taxable years 1973, 1974, 1975, 1976 and 1977. We *106 must now decide whether any part of these underpayments was due to fraud. Section 6653(b)provides: (b) FRAUD.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * The burden of proving fraud is on respondent, and he must do so by clear and convincing evidence. Rule 142(b); sec. 7454(a); Stone v. Commissioner,56 T.C. 213, 220 (1971). This burden is met if it is shown that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes and that there is an underpayment of tax. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983); Acker v. Commissioner,26 T.C. 107 (1956). *107 When fraud is asserted, as in the instant case, for more than one taxable year, respondent must show that some part of the underpayment was due to fraud for each taxable year for the corresponding addition to tax to be upheld. Professional Services v. Commissioner,79 T.C. 888, 930 (1982); Otsuki v. Commissioner,53 T.C. 96, 105 (1969). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Rowlee v. Commissioner,supra at 1123; Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Since fraud can seldom be established by direct proof, the requisite intent may be inferred from a showing by respondent that petitioner's conduct was intended to conceal, mislead or otherwise prevent the collection of taxes that petitioner knew or believed he owed. Stoltzfus v. United States,supra;Professional Services v. Commissioner,supra.Since respondent's *108 assertion of fraud requires an inquiry into the taxpayer's frame of mind, a single act or omission seldom demonstrates the necessary fraudulent intent. Rather, the existence of the requisite fraudulent intent must generally be determined by surveying a taxpayer's entire course of conduct. Stone v. Commissioner,supra at 223-224; Stratton v. Commissioner,54 T.C. 255, 284 (1970). In support of respondent's assertion that the imposition of the addition to tax for fraud is warranted, he points to the entire course of petitioner's conduct in: (1) engaging in illegal activities; (2) failing to file returns for four consecutive years; (3) failing to report substantial business income, his salary from Stanford, and the gain on the sale of his residence, all of which he knew constituted taxable income; (4) dealing in cash; (5) filing false W-4's to avoid having Federal income tax withheld from his salary; (6) his efforts in concealing his laetrile distribution activities; (7) his pattern of failing to make estimated tax payments; (8) his failure to cooperate with the revenue agent during the audit examination; and (9) his failure to maintain adequate *109 records. Petitioner, on the other hand, argues that instead of engaging in a scheme to avoid paying income taxes, he was "the intellectual author of, and chief advocate for, not only the vindication and use of laetrile in cancer therapy, but [also] the concept of medical freedom of choice." In this regard, petitioner contends that he failed to file returns reporting his laetrile distribution activities to avoid alerting the FDA to the size and scope of his operations. He further asserts that any attempts to conceal his laetrile distribution activities, such as the cash nature of their operations, were also designed to frustrate FDA investigations and not the Internal Revenue Service. Finally, petitioner argues that he did not personally profit from the partnership's laetrile distribution activities because his share of the resultant profits were channeled into the Committee's laetrile legalization efforts. After an exhaustive review of the record, we hold that respondent has carried his burden of proving petitioner's fraudulent intent with respect to the underpayments for the years in issue by "clear and convincing" evidence. While petitioner's alleged altruistic *110 motivations concerning his laetrile distribution activities may be exemplary, his actual methodology leaves much to be desired. Petitioner knowingly failed to file Federal income tax returns for the taxable years 1974, 1975, 1976, and 1977. He freely admitted knowing that he was required to file returns reporting his income generating activities for these years. While the failure to file tax returns, even over an extended period of time, does not perse establish fraud, Cirillo v. Commissioner,314 F.2d 478 (3d Cir. 1963), the failure to file returns is persuasive circumstantial evidence of fraud. Marsellus v. Commissioner,544 F.2d 883, 885 (5th Cir. 1977); see also Stoltzfus v. United States,supra at 1005. This failure to file returns also occurred despite repeated admonitions by his legal counsel to do so. In this context, petitioner's inaction weighs heavily against him. Further, during the taxable years in issue, petitioner knew he had received both wages from Stanford and substantial amounts of income *111 according to the self-serving reconstructions of the partnership's books. Such consistent substantial omissions of income, without more, support the inference of willfully fraudulent conduct. Holland v. United States,348 U.S. 121, 139 (1954); Schwarzkopf v. Commissioner,246 F.2d 731, 734 (3d Cir. 1957), affg. a Memorandum Opinion of this Court. Reporting income from these sources would not reveal his illegal activities to government authorities. The record also strongly contradicts petitioner's claim that his dispute with the government was confined to the FDA. Petitioner's failure to maintain books and records of his income producing activities is another indicia of an attempt to defraud the taxing authorities. Otsuki v. Commissioner,supra at 109. The evidence also domonstrates that the partnership's decision to use cash in its transactions was partly motivated by petitioner's desire to avoid detection of his income producing activities, a further evidence of fraud. His filing of false W-4 certificates claimingan excessive number of exemptions is also evidence of fraudulent intent. Stephenson v. Commissioner,79 T.C. 995, 1007 (1982). *112 Finally, petitioner's refusal to cooperate in the attempt to determine his correct tax liability is, in this context, further indicia of fraud. Rowlee v. Commissioner,supra at 1125; Professional Services v. Commissioner,supra at 933. Petitioner's claim that he did not personally profit from the partnership's laetrile distribution activities because his share of the resultant profits were channeled into Committee activities has not been satisfactorily proven. The lack of detailed books, records and receipts precludes any accurate determination of what really occurred. Further, as petitioner has failed to prove that the Committee was a qualified recipient under section 170(c)(2), no charitable contribution deductions are allowable for the years in issue even if petitioner had been able to satisfactorily substantiate his contributions. Accordingly, subject to our holding that petitioner received 50 percent of the partnership's profits during the years in issue, the additions to tax for fraud sought by respondent pursuant to section 6653(b) are upheld. Rule 142(b). The remaining addition to tax issue involves petitioner's failure *113 to pay estimated income tax. As discussed earlier, the Commissioner determined in his April 15, 1980, notice of deficiency that the imposition of this addition to tax pursuant to section 6654 upon petitioner was warranted. These determinations (and the amounts set. forth in the notice of deficiency) are presumptively correct, Welch v. Helvering,290 U.S. 111, 115 (1933), and petitioner bears the burden of proving them to be erroneous. Rule 142(a). In his amended answer, respondent now seeks increased additions to tax pursuant to section 6654 and he, of course, bears the burden of proof concerning the additional sums sought with respect to the taxable years 1976 and 1977. Rule 142(a). Respondent asserts that the stipulation of facts and evidence clearly shows that petitioner received substantial net income from his laetrile distribution activities for the years in issue. As the result of this and petitioner's failure to pay any estimated taxes on such income, respondent contends that the additions to tax should be imposed. Petitioner did not specifically address this issue in his brief. We have previously held that *114 the imposition of the addition to tax under section 6654 is mandatory when an individual taxpayer fails to make the required estimated tax payments unless the petitioner can place himself within one of the exceptions provided for in subsection (d). Grosshandler v. Commissioner,75 T.C. 1, 20-21 (1980). Respondent has satisfactorily proven petitioner's failure to make the required tax payments for the years in issue. Petitioner has not proven that he falls within one of the enumerated exceptions. Accordingly, subject to our holding that petitioner was in equal partnership with Frank Salaman for the years in issue, the additions to tax sought by respondent are upheld. Rule 142(a). Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in issue, and all rule references are to this Court's Rules of Practice and Procedure.↩
2. The term "laetrile" was first proposed by Ernest T. Krebs, Jr., about 1949 to generally reference the beta-cyanogenic glucosides, which include the pharmaceutical substance Amygdalin and any of its chemical derivatives. Laetrile is also known as vitamin B-17, Kemdalin and by several other trade names.↩
3. At trial, petitioner contended that laetrile could be successfully used in the treatment of cancer provided it was used in conjunction with other unspecified therapy programs.↩
4. Rutherford v. United States,↩ No. CIV-75-0218-B.
5. United States v. Bradford,↩ No. 76-0448-Criminal.
6. See Estate of Todisco v. Commissioner,T.C. Memo. 1983-247↩.