LAWRENCE NELSON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; HYLA NISSINOFF, a/k/a/ HYLA NELSON, a/k/a/ HYLA CARR, a/k/a HYLA CAPLAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Nelson v. Commissioner
Docket Nos. 3808-77; 5561-77.
United States Tax Court
T.C. Memo 1987-369; 1987 Tax Ct. Memo LEXIS 369; 53 T.C.M. (CCH) 1448; T.C.M. (RIA) 87369; July 27, 1987. Lawrence Nelson, pro se. Hyla Caplan Nelson, pro se. Constance L. Couts, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Lawrence Nelson
Hyla Nissingoff
Taxable
Additions to Tax
Additions to Tax
Year
Deficiency
Section 6653(b)[1]
Deficiency
Section 6653(b)
1968
$ 11,480.79
$ 5,751.89
--
--
1969
13,602.77
6,973.78
$ 10,424.11
$ 5,212.06
1970
50,615.88
25,307.94
55,361.90
27,680.95
1971
29,125.84
14,562.92
36,281.35
18,140.67
The issues for decision in these consolidated cases are as follows: (1) whether the *373 period of limitations had expired with respect to the taxable years at issue; (2) whether petitioners had unreported income from various adult theaters for the taxable years at issue; (3) whether petitioners received constructive dividends by virtue of the payment of personal expenses by corporations owned by them; (4) whether petitioner Hyla Nissinoff is entitled to relief from liability for Federal income taxes upon community income as an innocent spouse under section 6013(e) or under section 66(c); and (5) whether petitioners are liable for the additions to tax under section 6653(b). FINDINGS OF FACT At the outset we seek to clarify the names of petitioners in this case. Petitioner Hyla Nissinoff was born Hyla Caplan. At various time she and other members of her family have used Carr as a surname. In February 1969, Hyla Caplan married Lawrence Nissinoff, the other petitioner in this case. Subsequently Lawrence Nissinoff legally changed his name to Lawrence Nelson. The court order changing his name also covered his wife, Hyla Caplan Nissinoff. For clarity we will hencefore refer to petitioners simply as Hyla and Larry. Larry and Hyla remained married throughout the *374 taxable years at issue. However, they subsequently divorced and Larry resided at San Francisco, California, and Hyla resided at Beverly Hills, California, at the time they filed their respective petitions in this case. Hyla and many of her ten brothers and sisters have long been involved, to varying degrees, in the adult and burlesque theater business throughout the United States. The Caplans operated theaters in Pittsburgh, Pennsylvania, St. Petersburg, Florida, Pensacola, Florida, and in New Jersey prior to or during the taxable years at issue. Mary Caplan, Hyla's brother, is apparently head of the clan and his influence over family operations is apparent. Ownership of the Caplan family theaters is, however, often difficult to determine. Corporations were often created to own the various theaters, but ownership of these corporations did not always correspond to the actual ownership of the theaters. Various members of the Caplan family purchased property as nominees for other family members. Income from the theaters was often shared freely among family members. It was a common procedure in Caplan family operations to skim a portion of the daily cash receipts to avoid taxes *375 on that amount. In the late 1960's Hyla owned, operated, and managed the Sun Arts Theatre in St. Petersburg, Florida. After Larry and Hyla met, but before they were married, she and other Caplan family members taught Larry the adult theater business including how to skim receipts. On August 4, 1967, Hyla Theatres, Inc., was incorporated under the laws of California to lease and operate the T&D Theatre in Oakland, California. Hyla and Larry were among the incorporators and initial members of the board of directors of Hyla Theatres, Inc. Hyla owned 50 percent of the stock of Hyla Theatres, Inc. Hyla signed the lease of the T&D Theatre on behalf of Hyla Theatres, Inc. Hyla applied for a permit in her name. On the application she indicated that she had 9 years' experience operating movie theaters in Florida. Hyla and Larry moved to California to operate the T&D Theatre, leaving operation of the Sun Arts Theater to Hyla's brother, Julian Caplan. They resided at 980 Sacramento Street, San Francisco, California, throughout the taxable years at issue. Together they ran the T&D Theatre, which showed adult films. The T&D Theatre was operated on a cash only basis. Each night *376 the cashier on duty placed the cash receipts, along with a daily turnstile tally giving the number of patrons, and a blank deposit slip into a night drop. The next day Larry, or someone working for him, would deposit only a portion of the previous day's receipts into a bank account maintained by Hyla Theatres, Inc. The amount deposited would be sufficient only to cover expected expenses plus a small profit. The remaining gross receipts, or skim, were kept by Larry. During 1969, from $ 100 to $ 500 per day was skimmed from the T&D Theatre. Larry or someone working for him destroyed accurate daily records. Only amounts actually deposited in the corporate bank account were reflected on the corporate accounting records. The bookkeeper for Hyla Theatres, Inc., prepared the tax returns for the corporation based upon the corporate accounting records. She was unaware that the records prepared by her did not reflect all income of the theater. Hyla was initially active in the operation of the T&D Theatre. In 1968 Larry purchased her interest in Hyla Theatres, Inc. The total purchase price was $ 5,000, $ 1,000 of which was paid initially, followed by 10 monthly installments of $ 400. *377 The $ 400 monthly installments were deposited by Larry into a bank account over which Hyla had sole signatory authority at the Bank of America, Powell Street Branch. Following the sale of her interest in Hyla Theatres, Inc., Hyla no longer actively participated in the operation of the T&D Theatre. On February 19, 1969, Peekarama, Inc., was incorporated under the laws of California. Peekarama, Inc., was formed to operate an adult theater called Peekarama I on Turk Street in San Francisco. Hyla and Larry were incorporators and directors of Peekarama, Inc. However, Peekarama, Inc., was owned at this time by Jack Caplan, one of Hyla's brothers. Hyla served as secretary/treasurer of Peekarama, Inc., through December 31, 1970. Larry served as vice president through December 31, 1969. During 1969 Ida Caplan Reilly operated Peekarama I with the assistance of Hyla. Beginning in March 1969, currency deposits, representing skimmed receipts from Peckerama I, were made into Hyla's account at the Bank of America, Powell Street Branch. In 1970 Larry purchased an interest in the Peekarama I theater from Jack Caplan for a total purchase price of $ 35,000. Larry was required to pay $ *378 20,000 of the purchase price in cash with the balance payable in installments of $ 300 per week for 50 weeks. In April 1970 another adult theater, known as Peekarama II, opened on Kearny Street in San Francisco. Jack Caplan and Larry had equal interests in Peekarama II. Under the terms of this venture, Larry was to operate the theater and was required to pay over to Jack $ 1,500 a week out of skimmed proceeds. Larry could keep any excess skim. As a result Larry began paying a total of $ 1,800 per week to various Caplan family members in satisfaction of these obligations to Jack Caplan. Larry maintained a sign-off sheet to show that the weekly skim amounts due to Jack Caplan had been paid. Larry would have whichever Caplan family member who received a payment initial the sigh-off sheet to acknowledge receipt of the payment. Because the Caplan family often shared the profits derived from their various businesses, the person who received the Peekarama skim from Larry would frequently keep the money for his own needs rather than giving it to Jack. Hyla received and initialled for several of these payments, many of which she kept. Skimming was carried out at the Peekarama I *379 and II in much the same fashion as at the T&D Theatre and other Caplan family theaters. Actual bank deposits were used to prepare corporate records and the return preparer filled out the corporate tax returns based upon those incomplete records. The return preparer was unaware of the skimming operation. In 1970 the skim from Peekarama I alone approximated $ 400,000 to $ 500,000. In July 1970, Larry and Louise Caplan, Hyla's sister, formed a partnership to operate a theater in Las Vegas called the Mini-Adult Theatre. Larry and Louise Caplan each had a 50-percent ownership interest in this partnership. Larry hired Harold Erlandson to pick up daily receipts from the Mini-Adult Theatre. He was to deposit only a portion of those receipts sufficient to cover expenses in the partnership bank account. Larry instructed Erladson to skim the receipts of the Mini-Adult Theatre in the following manner: On 1000 hold 7 Over 1000 holds 9 or more 500 to 1000 deposit 200 plus odd amount Below 500 hold 200
Erlandson was to hold the skim until it could be turned over t Larry, Hyla, or Louise Caplan. He kept an accurate record of total cash receipts, amounts deposited, and amount skimmed.
*380 Erlandson and Larry had signatory authority over the bank account maintained by the partnership at Valley Bank of Nevada. Erlandson paid the expenses of the Mini-Adult Theatre with checks drawn on the partnership bank account. Erlandson paid the theater manager, Jim Squires, $ 200 per week with a check drawn in the amount of $ 50 plus $ 150 in cash. The accountant for the partnership prepared the partnership books based upon the actual bank deposits and the checks written by Erlandson. The accountant was assured at various times by Erlandson, Hyla, and Squires that all receipts of the partnership were deposited. Records maintained by Erlandson showed that gross receipts from the operation of the Mini-Adult Theatre for the taxable year 1970 totalled $ 104,080, but only $ 54,711.14 of that amount was deposited in the partnership bank account. For the first three months of 1971, his records indicate that gross receipts totalled $ 47,040 of which only $ 24,400 was deposited into the partnership bank account. Separate records of daily and monthly receipts maintained by Squires correlated almost identically with those kept by Erlandson. In March or April 1971, Larry ceased his *381 involvement with the Mini-Adult Theatre. He gave his 50-percent partnership to Hyla. She continued in the partnership with Louise Caplan through the end of 1971. Skimming continued after Larry withdrew from the partnership. Soon after Larry gave his partnership interest to Hyla, Squires replaced Erlandson as the person responsible for depositing a portion of the daily cash receipts and holding the skim until it cold be delivered to Hyla or Louise Caplan. The signature card for the partnership bank account was changed to add Squires and delete Larry and Erlandson. The average amount of deposits into the bank account maintained by the partnership did not increase after Larry left the partnership. The partnership books continued to be prepared using only actual bank deposits to calculate gross receipts. Throughout the taxable years in issue Hyla and Larry maintained a high standard of living. They lived in an apartment in San Francisco and Hyla maintained an apartment in New York City. They traveled to Europe with other Caplan family members for extended vacations in 1969 and 1970. Larry also purchased two fur coats for Hyla at a cost of over $ 14,000. Personal expenses of Larry *382 and Hyla, such as furniture and automobile rentals, rent on their residence at 980 Sacramento Street, and telephone expenses were paid out of the bank accounts of Peekarama, Inc., and Hyla Theatres, Inc. During the taxable years in issue Larry and Hyla maintained a safe deposit bos at the United California Bank, Nob Hill Branch. Larry frequently placed skim from Peekarama I, Peekarama II, and the Mini-Adult Theatre in the safe deposit box. Between May 19, 1969, and August 24, 1972, Larry made 163 entries into the safe deposit box. Hyla made at least two entries into the safe deposit box during this period of time. The safe deposit box would sometimes contain as much as $ 150,000 mainly in $ 100 bills. In March or April 1971 Larry turned over $ 100,000 from the safe deposit box to Hyla. During the taxable years in issue Larry maintained several checking and savings accounts in his name. He maintained checking accounts at the United California Bank, Nob Hill Branch, and the United California Bank, Oakland Main Office. He maintained savings accounts at the United California Bank, Oakland main office, Bank of America, Oakland Main Branch, and the Bank of America, Westwood Branch. *383 In addition to the account she maintained at the Bank of America, Powell Street Branch, Hyla maintained a checking account at the Hibernia Bank in San Francisco during the taxable year 1971. For the taxable year 1968, Larry received a Form W-2 showing wages from Hyla Theatres, Inc., in the amount of $ 1,050. On his individual Federal income tax return he indicated his filing status as single. The only reported income on this return is the $ 1,050 in wages from Hyla Theatres, Inc. For the taxable year 1969, Larry had W-2 wages of $ 7,800 from Hyla Theatres, Inc. On his individual Federal income tax return he indicated his filing status as married filing separately. He reported $ 3,900 as his community property share of his Hyla Theatres, Inc., wages. A separate return was filed in the name of Hyla reporting $ 3,900 as wages, which represented her share of community income. This return reflected her San Francisco address and indicted her filing status as married filing separately. However, Hyla did not authorize this return. Instead, she filed a return using her maiden name reflecting a St. Petersburg, Florida, address on which she indicated her her filing status as unmarried *384 head of household. On this return she reported a loss of $ 5,419.99 from the operation of the Sun Arts Theatre in St. Petersburg. She did not report any amount as her community share of income earned by Larry. For the taxable year 1970, Larry had W-2 wages of $ 7,000 from Peekarama, Inc., and $ 7,800 from Hyla Theatres, Inc. On his individual Federal income tax return, on which he again indicated his filing status as married filing separately, Larry reported wages of $ 7,400 representing his community property share of his wages. He reported no other income. The other one half of his wages was reported on a return filed in the name of Hyla reflecting her San Francisco address. Hyla did not authorize this return. Instead she authorized her brother Julian Caplan to file a return on her behalf. This return, filed in her maiden name, showed a Florida address and indicated her filing status as unmarried head of household. On this return she reported gross income of $ 9,627.13 from the operation of the Sun Arts Theatre. She did not report any amount as her community share of income earned by Larry. For the taxable year 1971, Larry had W-2 wages from Hyla Theatres, Inc., and *385 Peekarama, Inc., totalling $ 14,050. He also had gross receipts of $ 42,812 and net income of $ 7,806 from Nelson and Associates, a business that ostensibly provided management and business services to Hyla Theatres, Inc., and Peekarama, Inc. He reported these amounts on an individual tax return on which the filing status was indicated as married filing jointly. Hyla did not authorize, nor did she sign, this return. Larry had asked her to sign a joint return, but she refused. However, Julian Caplan filed a return on her behalf under her maiden name using the St. Petersburg, Florida, address on which gross income of $ 114,310 and net income of $ 7,530.91 was reported form the operation of the Sun Arts Theatre. On March 18, 1976, a Federal grand jury returned a four-count indictment charging Larry with willful attempted evasion of his individual Federal income taxes for the years 1968, 1969, 1970, and 1971 under section 7201. On August 25, 1976, Larry pleaded guilty to one count of tax evasion concerning his tax liability for the taxable year 1969 and was sentenced by the district court to serve 2 years in jail and fined $ 5,000. The remaining counts charged in the indictment *386 were dismissed by the court. The Commissioner issued separate notices of deficiency to Larry and Hyla on March 17, 1977. Using the bank deposits method of income reconstruction, the commissioner determined that Larry had unreported income from the T&D Theatre and Peekarama I and II theaters as follows: Taxable Year
Amount
1968
$ 24,422.71
1969
17,292.55
1970
15,936.75
Except for the taxable year 1968, the above listed amounts constitute only one half of the total unreported income determined by the bank deposits method. This represents Larry's community property share of these amounts. The remaining one half of the unreported income from the T&D Theatre and Peekarama I and II Theaters for the taxable years 1969 and 1970 was determined to be taxable to Hyla. Based upon amounts deposited into her bank account, the Commissioner also determined that Hyla had additional unreported income from the Peekarama I and II. After a concession by the Commissioner, he asserts that Hyla and Larry are taxable on their community share of the unreported income received by her in the amount of $ 7,368 for the taxable year 1969. The Commissioner *387 also determined that Larry and Hyla had unreported income for the taxable years 1970 and 1971 from the Mini-Adult Theatre in the amounts of $ 26,858.57 and $ 40,712.32, respectively. This determination was based on the specific item method of income reconstruction for the taxable year 1970 and for the period January 1, 1971, through March 31, 1971, based upon the records maintained by Erlandson and Squires. The deficiency determined for the remainder of 1971 is based upon a projection of the amount of partnership income derived from the actual cash bank deposits and the percentage skimmed in prior periods. In each case, the Commissioner determined that Larry and Hyla were taxable upon their respective community share of their 50-percent distributive share of partnership income. The Commissioner also determine that Hyla and Larry received constructive dividends for the taxable years in issue based upon the payment of personal living expenses with checks drawn upon the bank accounts of Peekarama, Inc., and Hyla Theatres, Inc., in the following amounts: Year
Amount
1968
$ 5,280.50
1969
5,418.00
1970
4,411.00
1971
140.00
The Commissioner *388 determined that Larry and Hyla were each taxable on their community share of these amounts for the taxable years 1969, 1970, and 1971. Although respondent now argues otherwise, the notice of deficiency issued to Hyla treats the unauthorized returns filed with a California address for the taxable years 1969 and 1970 as her true returns. As a result the income reported on the returns filed on her behalf in Florida is treated as additional taxable income. The notice of deficiency apparently treats the return filed by Hyla in Florida for the taxable year 1971 as her true return for that year. As a result the Commissioner determined that Hyla was liable for taxes on one half of the amount reported by Larry on the invalid joint return as her community share of that income. The deficiencies determined in the notices of deficiency as adjusted for subsequent concessions made by the Commissioner are summarized in the following table: Hyla
Larry
1968
Unreported skim from from
N/.A
$ 24,422.71
T&D Theatre
Constuctive Dividend
5,280.50
$ 29,703.21
1969
Unreported skim income from
$ 17,292.54
$ 17,292.55
T&D Theatre and
Peekarama I
Unreported skim income from
T&D Theatre and Peekarama
I deposited in Hyla's
bank account
3,684.00
3,684.00
Constructive Dividend
2,709.61
2,709.61
Income shown on invalid
California return
3,900.00
N/A
$ 27,586.15
$ 23,686.16
1970
Unreported skim from T&D
Theatre and Peekarama
I and II
$ 15,936.75
$ 15,936.75
Partnership share of
unreported skim income
from Adult-Mini Theatre
13,429.29
13,429.29
Constructive Dividend
2,205.50
2,205.50
Income shown on invalid
California return
7,400.00
N/A
$ 38,971.54
$ 31,571.54
1971
Partnership share of
unreported skim income
from Adult-Mini Theatre
$ 20,356.16
$ 20,356.16
Constructive Dividend
70.00
70.00
Community share of income
reported on invalid
joint return
10,428.00
(10,428.00)
$ 30,854.16
$ 9,998.16
*389 In March 1974, Hyla signed a power of attorney appointing a representative for the taxable years in issue. On March 29, 1974, her representative signed a Form 872, Consent Fixing Period of Limitation Upon Assessment of Income Tax, by which she agreed to extend the period of limitations with respect to the taxable year 1970 until December 31, 1974. This consent was signed by the District Director on April 2, 1974. On September 28, 1974, Hyla signed a Form 872 by which she agreed to extend the period of limitation with respect to the taxable year 1970 until December 31, 1975. This consent was signed by the District Director on October 1, 1974. Hyla and the District Director subsequently signed consents extending the period of limitations with respect to the taxable year 1970 to December 31, 1977. OPINION
1. Statute of Limitations
The claim that the statute of limitations bars assessment and collection of a deficiency determined by the Commissioner constitutes an affirmative defense. Rule 39. Hyla properly raised the statute of limitations in her petition. Rule 39. Generally, the Commissioner has 3 years after the return is filed in which to assess the tax. Sec. *390 6501(a). However, the notice of deficiency, generally a prerequisite to assessment, sec. 6213(a), was not mailed to Hyla until March 17, 1977, after the normal 3-year period of limitations had expired with respect to the taxable years covered in this notice. Nevertheless, in the event that respondent proves by clear and convincing evidence that there was an underpayment of tax and that a portion of such underpayment for any year was attributable to fraud, the period of limitations is tolled indefinitely and the notice of deficiency was timely. Sec. 6501(c)(1). Because we find that respondent has shown, by clear and convincing evidence, that a part of an underpayment of taxes for each of Hyla's taxable years in issue was attributable to fraud, the period of limitations remains open for each year (see discussion, infra).[2]
*391 Larry did not raise the statute of limitations in his pleadings or seek to amend his pleadings, Rule 141(a), therefore, it is not at issue as to him. Rollert Residuary Trust v. Commissioner,80 T.C. 619, 636 (1983), Markwardt v. Commissioner,64 T.C. 989, 997 (1975). Nevertheless, we point out that even if Larry had properly raised this defense, the period of limitations would be open because we find that part of an underpayment of taxes for each year at issue was attributable to fraud. (See discussion, infra.) Sec. 6501(c)(1).
2. Unreported Income
The Commissioner determined that, during the taxable years at issue, Larry and Hyla received income from adult theaters with which they were involved. The income included cash skimmed from gross receipts of the T&D Theatre in Oakland, California, the Peekarama I and Peekarama II theaters in San Francisco, California, and the Mini-Adult Theatre in Las Vegas, Nevada. Throughout the taxable years in issue Larry reported only minimal W-2 wages and, for the taxable year 1971, income from Nelson and Associates. On returns filed by or on behalf of Hyla with a Florida address, she reported only *392 income from the operations of the Sun Arts Theatre. Larry and Hyla refused to turn over whatever personal or business records they possessed to the Commissioner for examination. With the exception of records retained by Erlandson and Squires with respect to the Mini-Adult Theatre, other records reflecting actual gross receipts of the adult theaters were systematically destroyed. The Commissioner, therefore, relied on indirect as well as direct methods of income reconstruction in determining the deficiencies in this case. It is well settled that, in the absence of sufficient books and records, the Commissioner may reconstruct a taxpayer's income by any method which is reasonable. Sec. 446; Holland v. United States,348 U.S. 121 (1954); Cupp v. Commissioner,65 T.C. 68, 82 (1975), affd. in unpublished order 559 F.2d 1207 (3d Cir. 1977). The Commissioner is not prohibited from using a mixture of income reconstruction methods so long as the methods selected are reasonable under the particular circumstances. [3] The burden of proof is on petitioners to demonstrate that the amount of unreported income calculated by the Commissioner is incorrect. *393 Welch v. Helvering,290 U.S. 111 (1933). As set forth below, petitioners have failed to meet this burden of proof and the determination of the Commissioner is upheld with respect to unreported income. For the period from January 1968 through June 1970, the Commissioner used the bank deposits method of income reconstruction to determine the amount of unreported income received by Larry from the T&D Theatre and Peekarama I and Peekarama II theaters. During this period Larry deposited substantial amounts of cash into several checking and savings accounts he maintained. In his calculations, the Commissioner reduced the total deposits by checks, deposits and by specified nontaxable sources of income such as transfers between accounts and loans by family members, and increased the total available currency by net cash loans made by Larry to the corporations. The commissioner then deducted the amounts representing reported W-2 wages and a sale of stock to arrive at unreported income… The resulting unexplained cash deposits for the taxable years 1968 and 1969, ad the period January 1970 through *394 June 1970 totalled $ 24,422.71, $ 34,584, and $ 31,873.50. In addition, the Commissioner determined that unexplained cash deposits totalling $ 7,368 were made to a bank account maintained by Hyla during 1969. Except for the unexplained cash deposits made during 1968 to bank accounts maintained by Larry, the Commissioner determined that Hyla and Larry were each taxable on one half of all unexplained deposits as their community share of the unreported income. Petitioners have failed to meet their burden of proving that the Commissioner erred in reconstructing their income under the bank deposits method. Welch v. Helvering, supra;Rule 142(a). In fact Larry freely acknowledged that he received skim income in amounts greatly exceeding the amounts determined by the Commissioner. The facts clearly support his admission that petitioners received a substantial amount of unreported income from skimming receipts of the T&D Theatre and the Peekarama I and Peekarama II theaters. For the period from July 1, 1970 through March 31, 1971, the Commissioner relied upon the specific item method of income reconstruction to determine that petitioners received unreported income *395 from the Mini-Adult Theatre. In July 1970, Larry and Louise Caplan, a sister of Hyla, formed a partnership to operate the Mini-Adult Theatre. The Commissioner relied upon records maintained by Harold Erlandson, the person hired by Larry to collect daily receipts and make deposits into the bank account maintained by the partnership less a prearranged amount of skim. Erlandson maintained detailed daily records of the theater showing the number of patrons during each shift, the total cash receipts, the total book deposits, and the total skim held out for the period August 1, 1970 through April 3, 1971. Erlandson's records are corroborated by records maintained contemporaneously by Jim Squires, the theater manager. Larry admitted receiving the skim held by Erlandson. Erlandson testified that the partnership bookkeeper only received information about actual bank deposits and was ignorant of the skimmed receipts. The bookkeeper, Donald Skipworth, testified that he prepared the partnership books and records and tax returns from the deposit information and that he had been assured that all receipts had been deposited. Squires assumed responsibility for depositing gross receipts, less skim, *396 shortly after Larry turned over his partnership interest to Hyla. In a statement to special agents in 1972 Squires stated under oath that after he took over direct responsibility for the skimming operation he turned over skimmed receipts to Hyla and Louise. In her testimony, Hyla said she never received any money from Squires. Her credibility was undermined, however, by the introduction by respondent of a check drawn on the partnership bank account by Squires in the amount of $ 100 and made payable to "cash" and endorsed by Hyla. Moreover, following the acquisition by Hyla of the partnership interest from Larry, actual deposits into the bank account maintained by the partnership did not increase thereby suggesting that skimming continued unabated. Records of true gross receipts for the period after Erlandson's involvement with the Mini-Adult Theatre ceased in early April are not in the record. However, the skim operation continued at the theater under the control of Hyla and Louise through the end of 1971. Consequently, using a projection, the Commissioner determined the amount of skimmed income for the period April 1, 1971, through December 31, 1971. The Commissioner reviewed *397 the records of gross receipts maintained by Erlandson during the period August 1970 through March 1971. The true gross receipts according to these records were then compared to the record of actual deposits maintained contemporaneously by Erlandson, total deposits reflected in the partnership bank statements, and the amount of gross income reflected in the books maintained by Skipworth. These comparisons revealed that for the periods from August 1970 to March 1971 the amount of unreported skim ranged from 48.13 percent to 52.53 percent of total gross receipts. The agent used the smallest percentage, 48.13 percent, to calculate unreported amounts for the period April 1, 1971, through December 31, 1971. The Commissioner made other adjustments to partnership income, which petitioners do not contest. Hyla and Larry failed to report any partnership income or loss from the Mini-Adult Theatre for the taxable years 1970 and 1971. Consequently, in the respective statutory notices, the Commissioner determined that Hyla and Larry were each liable for tax on their community share of their 50-percent distributive share of partnership income. *398 In the absence of adequate books and records, the Commissioner appropriately relied on other available direct evidence of gross receipts. The use of a projection method of proof by the Commissioner was also reasonable in this case. Where the taxpayer's accounting system was designed to systematically exclude certain items of income from tax returns, the courts have reacted flexibly in allowing methods of income reconstruction. Gordon v. Commissioner,63 T.C. 51, 61 (1974), modified 63 T.C. 501 (1975), affd. per curiam 572 F.2d 193 (9th Cir. 1977) (taxpayer's income reconstructed by computing average daily gross gambling revenues and projecting such average over the entire period of gambling activity); Agnellino v. Commissioner,302 F.2d 797 (3d Cir. 1962), affd. on this issue a Memorandum Opinion of this Court (income from motel operations reconstructed based upon number of fresh sheets rented by the motel in each taxable year). Petitioners have failed to refute the determination made with respect to unreported income from the Mini-Adult Theatre. Rule 142(a). The notices of deficiency did not characterize the nature of *399 the unreported income, which the Commissioner determined that petitioners received. However, petitioners failed to demonstrate that the gross receipts diverted to petitioners from the T&D Theatre and the Peekarama I and II, and Mini-Adult Theatre do not represent taxable income in the form of wages, dividends, or their distributive share of partnership income. Rule 142(a). The Commissioner also determined that petitioners received constructive dividends, based upon the payment of certain of their personal expenses with funds drawn from the corporate bank accounts of Peekarama, Inc., and Hyla Theatres, Inc. The amounts paid were deducted on the respective corporate tax returns. It is well settled that expenditures made by a corporation for the personal benefit of its stockholders may constitute taxable income in amounts equal to the fair market value of the benefits received. Challenge Manufacturing Co. v. Commissioner,37 T.C. 650 (1962). Petitioners did not introduce any evidence to contest the Commissioner's determination as to constructive dividends and, therefore, failed to meet their burden of proof. *400 Welch v. Helvering, supra;Rule 142(a).
3. Community Property
Petitioners were married throughout the taxable years at issue and maintained their legal residence in California. California law defines community property as "property acquired by husband and wife, or either, during marriage when not acquired as the separate property of either." Cal. Civ. code sec. 687 (West 1982). Accordingly, respondent split the items of unreported income evenly and treated each half as the respective property of Larry and Hyla. See Cal. Civ. Code. sec. 5105 (West 1983). People v. Lockett,102 Cal. Rptr. 41, 25 Cal. App. 3d 433 (1972). Petitioners have shown no error in the method of apportioning the unreported income equally to each as community income. [4] However, Hyla argues on brief [5] that she is entitled to relief as an innocent spouse under section 6013(e). *401 Section 6013(e)(1), as amended by the Tax Reform Act of 1984, Pub. L. 98-369, sec. 424(a), 98 Stat. 801-802, provides that a spouse is relieved of liability under regulations prescribed by the Commissioner where a joint return has been made for a taxable year and on that return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, if the other spouse establishes that in signing the return she did not know, and had no reason to know, that there was such substantial understatement, and taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for the taxable year attributable to such substantial understatement. [6] All of the elements must be proven by the petitioning spouse in order to gain relief as an innocent spouse. Although Larry filed a putative joint return for the taxable year 1971, Hyla did not sign this return.[7] She steadfastly contended that she did not authorize this return and that she did not intend to file a joint return with him. She filed separate returns using a Florida address for the taxable year 1971 and for prior years. Because *402 Larry and Hyla did not file joint returns for any of the taxable years in issue, she cannot be relieved of tax liability under section 6013(e). Galliher v. Commissioner,62 T.C. 760 (1974), affd. without published opinion 512 F.2d 1404 (5th Cir. 1975). *403 Although not entitled to relief under section 6013(e), we must still decide if she is entitled to relief under section 66(c). Prior to the Tax Reform Act of 1984, supra,section 66 provided relief to a spouse from liability on his or her community share of income earned by the other spouse in limited circumstances. Relief under section 66 was previously available only if husband and wife lived apart during the entire taxable year, filed separate returns, and one spouse earned income that was not transferred to the other spouse. Believing that there may be additional situations in community property states where relief from tax liability on a spouse's community share of income earned by the other spouse is warranted, Congress added section 66(c) as part of the Tax Reform Act of 1984, supra, sec. 424(b)(1); see H. Rept. 98-861 (1984), 1984-3 C.B. (Vol. 2) 373. Section 66(c), which is made retroactively applicable to the taxable years at issue, provides as follows: (c) Spouse Relieved of Liability in Certain Other Cases. -- Under Regulations Prescribed by the Secretary, if -- (1) an individual does not file a joint return for any taxable year, (2) such individual *404 does not include in gross income for such taxable year an item of community income properly includible therein which, in accordance with the rules contained in section 879(a), would be treated as the income of the other spouse, (3) the individual establishes that he or she did not know of, and had no reason to know of, such item of community income, and (4) taking into account all facts and circumstances, it is inequitable to include such item of community income in such individual's gross income,
then, for purposes of this title, such item of community income shall be included in the gross income of the other spouse (and not in the gross income of the individual).
The taxpayer seeking relief under section 66(c) must demonstrate that he or she has satisfied all four requirements. Hyla has satisfied the requirement that no joint return be filed for any taxable. year. Sec. 66(c)(1). We conclude, however, that Hyla was too directly and substantially involved with Larry's theater operations to satisfy the requirement that she did not know, or have reason to know, that Larry had community income for which she is otherwise liable. Sec. 66(c)(3). Therefore, she is not entitled *405 to relief under section 66(c). [8]
4. Additions to Tax for Fraud
Having sustained the Commissioner's determinations that petitioners are liable for tax on unreported income, we turn to the issue of whether the addition to tax for fraud under section 6653(b) should be imposed. The Commissioner determined that Larry and Hyla were liable for additions to tax for fraud under section 6653(b) for each of the taxable years in issue. [9]The burden of proving fraud is on respondent, and he must do so by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Stone v. Commissioner,56 T.C. 213, 220 (1971). This burden may be met by showing that the taxpayer intended to conceal, mislead, or otherwise prevent the collection of taxes, and that there is an underpayment of tax. *406 Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Rowlee vs Commissioner,80 T.C. 1111, 1123 (1983). However, respondent cannot satisfy his burden of establishing fraud by relying solely on the failure of the taxpqyer to discharge his burden of proving error in the determination of the deficiency. Otsuki v. Commissioner,53 T.C. 96, 106 (1969). It is unnecessary for respondent to prove the exact amount of income that was fraudulently unreported, as section 6653(b), for the years at issue [10] applies to each year if any portion of an underpayment for each year is attributable to fraud. Professional Services v. Commissioner,79 T.C. 888, 930 (1982); Otsuki v. Commissioner, supra at 105. The existence of fraud is a question of fact to be resolved upon a consideration of the entire record. Rowlee v. Commissioner, supra at 1123; Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion *407 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Fraud may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. Stephenson v. Commissioner,79 T.C. 994, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984); Gajewski v. Commissioner, supra at 200. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Spies v. United States,317 U.S. 492 (1943); Gajewski v. Commissioner, supra at 200; Stone v. Commissioner, supra at 223-224. Because the Commissioner determined that Larry and Hyla were each liable for the addition to tax for fraud with respect to their respective deficiencies, we consider separately whether respondent's burden of proof has been satisfied. *408 Larry
On March 18, 1976, a Federal grand jury returned a four-count indictment charging Larry with willful attempted evasion of his individual Federal income taxes for the taxable years 1968, 1969, 1970, and 1971 under section 7201. Larry pleaded guilty to one count of tax evasion regarding his tax liability for the taxable year 1969. The remaining counts charged in the indictment were dismissed. As a result of his plea of guilty to the charge under section 7201 for the taxable year 1969, Larry is estopped to deny fraud in this proceeding with respect to the imposition of the addition to tax under section 6653(b) for that year. Moore v. United States,360 F.2d 353 (4th Cir. 1965), cert. denied 385 U.S. 1001 (1967). It matters not for our purpose that his conviction was based upon his plea of guilty rather than a jury verdict. Gray v. Commissioner,708 F.2d 243, 246 (6th Cir. 1983), cert. denied 466 U.S. 927 (1984). However, Larry's conviction under section 7201 for 1969 does not prohibit him from denying fraud for the other years with respect to which charges were dismissed. See *409 Wittenberg v. United States,304 F. Supp. 744 (D. Minn. 1969). Nevertheless, we are satisfied that respondent has carried his burden of proof for the taxable years 1968, 1969, 1970, and 1971. For the taxable years at issue, Larry filed returns, reporting only small amounts as wages from Hyla, Inc., and Peekarama, Inc. He reported no partnership income from the operation of the Mini-Adult Theatre. He now freely admits that he received amounts skimmed from the gross receipts of various adult theaters in amounts much greater than he reported on his Federal income tax returns. The adult theater business is essentially an all cash business. Consistent with all Caplan family theaters, only a small amount of total gross receipts, sufficient to cover expenses and generate a small profit, was deposited from the T&D Theatre, the Peekarama I and II Theatres, and the Mini-Adult Theatre during the taxable years in issue. The tax returns for these theaters were prepared based upon actual bank deposits and checks written, not upon actual cash receipts. A pattern of consistent underreporting of income for a number of years, especially when accompanied by other indications of *410 fraud, justifies the inference of fraud as to each of the years. Holland v. United States,348 U.S. 121, 129 (1954); Baumgardner v. Commissioner,251 F.2d 311 (9th Cir. 1957); Brooks v. Commissioner,82 T.C. 413, 431 (1984), affd. in an unpublished opinion 772 F.2d 910 (9th Cir. 1985). In this case, the inference of fraud drawn from the consistent pattern of underreporting skim income is amply bolstered by other indicia of fraud. Larry, personnel under his direction, and other Caplan family members systematically destroyed contemporaneous records of true cash receipts from the various theaters. Destruction of books and records is an unequivocal "badge of fraud". Spies v. United States,317 U.S. 492, 499 (1943). [11] Some records, however, were not destroyed and were introduced by respondent to show the existence of the skimming operation. The bookkeepers for the T&D Theatre, Peekarama I and II Theatres, and the Mini-Adult Theatre were not informed that only a portion of cash receipts were deposited into the various business bank accounts. Failing to disclose information to an accountant or return *411 preparer is also an indication of fraud. See Baumgardner v. Commissioner, supra at 323. Although he now admits that he received unreported income, Larry refused to turn over records to respondent's agents. Such failure to cooperate is circumstantial evidence of fraud. See Millikin v. Commissioner,298 F.2d 830, 836 (4th Cir. 1962), affg. a Memorandum Opinion of this Court; Powell v. Granquist,252 F.2d 56, 61 (9th Cir. 1958); Baumgardner v. Commissioner, supra at 323. Larry also kept large amounts of cash in a safe deposit box into which he made numerous entries. Viewed in context, this is circumstantial evidence of an intent to conceal assets, and, therefore, an indication of fraud. Spies v. United States, supra at 499. *412 Hyla
Hyla filed separate returns and the Commissioner imposed the addition to tax under section 6653(b) in the notice of deficiency mailed to her. We thus separately examine her entire course of conduct to decide if any part of her underpayment of tax for the taxable years 1969, 1970, and 1971 is due to fraud. She would have us characterize her as a subservient wife with only minimal involvement with Larry's business ventures. The record in this case, however, paints a different picture. She contends that the damaging testimony given by Larry, from whom she is now divorced, was motivated by desire for revenge because of his belief that Hyla and members of her family were responsible for the investigations that led to his criminal convictions. Based upon our observation during the pendency of this suit, there is obvious animosity between Hyla and Larry. Nevertheless, we consider the testimony of Larry to be more credible than that proffered by Hyla. We hold that respondent has meet the burden of of showing fraud as to Hyla by clear and convincing evidence. As we previously held, Hyla consistently underreported income for the taxable years 1969, 1970, and 1971. Such *413 consistent underreporting of income is persuasive evidence of fraud. Holland v. United States, supra;Baumgardner v. Commissioner, supra;Brooks v. Commissioner, supra.
Hyla was involved in various Caplan family theaters for many years. She owned the Sun Arts Theatre in St. Petersburg and continued to operate it until she moved to California. Her familiarity with the business is illustrated by the fact that she taught Larry various facets of the business including financial aspects. We are satisfied that skimming occurred in most, if not all, Caplan family theaters including the Sun Arts Theatre. Hyla moved to California with Larry to operate the T&D Theatre. She was an officer, shareholder, and 50-percent owner of Hyla Theatres, Inc., which owned the T&D Theatre. She was active in the operation of the T&D Theatre only until early 1968, a year not before the Court as to Hyla, when she sold her 50-percent interest in the theater to Larry. Although she no longer actively participated in the operations of the T&D Theatre, she did assist with the Peekarama I, which opened in early 1969. Hyla contends that she did not actively *414 assist operations of the Peekarama I Theatre in 1969. We find her testimony on this to be incredible. Beginning one month after the Peekarama I theater opened, unexplained cash deposits were made to a bank account over which she had sole signatory authority. She attempts to explain these deposits by stating that she consented to use this account to purchase film for the theater. This explanation, however, conflicts with her contention that she did not help operate the Peekarama I, but only offered sporadic advice. These deposits are more plausibly explained as her share of the skim from the gross receipts of this theater. In 1970 Hyla received from Larry cash, which had been skimmed from Peekarama I and II. Some of this cash she turned over to Jack Caplan or other Caplan family members, and some she kept for herself. In 1971 she received from Larry his 50-percent interest in the Mini-Adult Theatre in Las Vegas. She began actively overseeing theater operations, including skimming of gross receipts, with her sister, Louise Caplan. Squires took over the responsibility for actual collection of daily receipts and for depositing only a small portion of such receipts in the partnership *415 bank account. He held the skim until Hyla or Louise Caplan could pick it up. Hyla denies ever receiving any money from Squires, but, as we have already concluded, her testimony on this point is not credible. After she began her involvement, the partnership records continued to be prepared by use of bank records, which failed to reflect all receipts. Despite her claims to the contrary, the record reveals that she substantially participated in the operation of the various theaters during 1969, 1970, and 1971 and, more particularly, the practice of skimming the gross receipts from those theaters to avoid taxation on those amounts. Another indication of fraud is the fact that she filed separate returns under the name Hyla Caplan reflecting a Florida address on which she indicated her filing status as single head of household. We find her excuses for filing in this manner to be incredible. She was married to Larry throughout the taxable years at issue so she clearly did not qualify for the single head of household filing status. She did not report on these returns her community share of Larry's minimal W-2 income or his skim income. She also failed to report as income amounts deposited *416 in 1970 into the bank account over which she had sole signatory authority representing skim income from the Peekarama theaters. We think it may reasonably be inferred that she filed a return in Florida under her maiden name indicating that she was single in order to counsel the fact that she had taxable community income. [12] This inference is strengthened by Larry's testimony that he asked her to file joint returns and she refused. Hyla also refused to turn over records to respondent. Such action is an indication of fraud. See Millikin v. Commissioner, supra;Powell v. Granquist, supra;Baumgardner v. Commissioner, supra at 323. *417 In conclusion, we find that respondent has demonstrated, by clear and convincing evidence, that part of an understatement in tax for Hyla's taxable years 1969, 1970, and 1971 is attributable to fraud. Accordingly, we uphold the additions to tax under section 6653(b) as to her. To reflect concessions made by respondent, Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the relevant years, and all Rule reference are to the Rules of Practice and Procedure of this Court. ↩
2. The period off limitations with respect to Hyla's taxable year 1970 was extended by several consents until December 31, 1977. Therefore, the notice of deficiency was also timely under sec. 6501(c)(4). Furthermore, the normal 3-year period of limitations for her taxable years 1970 and 1971 was extended to 6 years because for those years, there exists a substantial omission of gross income within the meaning of sec. 6501(e)(1)↩ and, for this reason, the notice of deficiency was also timely as to those years. 3. See Casciani v. Commissioner,T.C. Memo. 1967-203↩. 4. Respondent treated the income reported by Hyla from the Sun Arts theatre as taxable only to her as this theater was her separate property. See Cal. Civ. Code sec. 5107↩ (West 1983). 5. The Court ordered the parties to file seriatim briefs. Respondent filed a timely brief, Larry filed no brief, and Hyla filed a two page letter, which we have treated as her brief. ↩
6. Sec. 6013(e)(1) provides as follows: (e) Spouse Relieved of Liability in Certain Cases. -- (1) In general. -- Under regulations prescribed by the Secretary, if -- (A) a joint return has been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to known, that there was such substantial understatement, and (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement. Section 6013(e)↩, as amended, is applicable to Hyla for the taxable years in issue. Tax Reform Act of 1984, Pub.L. 98-369, sec. 424(c), 98 Stat. 494, 803 7. Considerable confustion exists over which returns filed in Hyla's name should be treated as her true returns. For the taxable years 1969 and 1970, Federal income tax returns were filed in the name of Hyla Nissinoff reflecting a San Francisco address. For 1971 Larry filed a joint return that Hyla did not sign or authorize. For the taxable years 1969, 1970 and 1971 returns were also filed by or on behalf of Hyla reflecting a St. Petersburg, Florida address. Although the notice of deficiency treated the returns filed with the San Francisco address as her true returns for the taxable years 1969 and 1970, Hyla and respondent now agree that the returns filed with the St. Petersburg, Florida address should be treated as her true returns for each of the taxable years at issue. ↩
8. Cf. Baldwin v. Commissioner,T.C. Memo. 1986-342; Bozek v. Commissioner,T.C. Memo. 1986-37; Sanders v. Commissioner,T.C. Memo. 1986-26; Rimple v. Commissioner,T.C. Memo. 1985-245↩.
9. Sec. 6653(b) provides: (b) Fraud. -- (1) In General. -- If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. ↩
10. Sec. 6653(b)↩ has been amended, effective for returns due after December 31, 1986, by sec. 1503(a) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2742. The addition to tax for fraud, increased from 50 percent to 75 percent, is now applicable only to the portion of an underpayment that is attributable to fraud. However, after respondent carries his burden of proving fraud, the taxpayer must prove what portion of the underpayment is not attributable to fraud.
11. In admitting that records were destroyed, Larry acknowledged his fraudulent intent as follows: Q. Were any records maintained of the true intake of the theater. A. I believe so. * * * Q. Where these destroyed from time to time? A. Normally, yes. Q. For what reason? A. Why would we keep them around? You're doing something wrong why would you leave the evidence around. Q. Were you aware you were doing something wrong. A. Yes.↩
12. The only ready alternative explanation is that Hyla had sold the Sun Arts Theatre to her brother Julian sometime prior to or during the taxable years in issue and that she remained as owner in name only. The Florida returns reporting income from the Sun Arts Theatre and filed in her name would, therefore, serve to hide the true ownership of this theater. If so, then the returns filed with a California address under Hyla's name are quite likely her true returns, a fact which she has consistently denied. ↩